215 P.3d 945 (2009)
149 Wash.App. 614
STATE of Washington, Respondent,
v.
Conrad FALLENTINE, Appellant.
No. 60177-6-I.
Court of Appeals of Washington, Division 1.
January 20, 2009.
Publication Ordered March 31, 2009.
*946 Susan Wilk, Seattle, for Appellant.
Catherine M. McDowall, Seattle, for Respondent.
ELLINGTON, J.
¶ 1 The confrontation clause allows introduction of hearsay statements where the defendant has procured the unavailability of the declarant by wrongdoing. The trial court did not err in admitting Anthony Clark's statements at Conrad Fallentine's trial. We reject Fallentine's other claims of error and affirm.

BACKGROUND
¶ 2 On February 11, 2005, Barbara Perkins' house was set on fire. The house was left largely intact, but the interior of the main floor was destroyed, and many of Perkins' exotic birds were killed. Perkins suspected her nephew, Conrad Fallentine, had set the fire.
¶ 3 At the time of the fire, Fallentine lived with his wife Heidi[1] and their young child. Also living with them was Heidi's brother, Anthony Clark, who had been shuttled through various foster homes before being placed with Heidi and Fallentine in the summer of 2004.
¶ 4 The Fallentines' relationship was unstable. In early January 2005, Heidi took their young daughter and went to stay with Barbara Perkins and her husband. Fallentine repeatedly called Perkins' house to speak with Heidi. On one occasion, he called at dinnertime, and Perkins asked him to call back. Fallentine became enraged, was "almost incoherent,"[2] and cursed Perkins for taking in his family.
¶ 5 Heidi later decided to return home, but asked Perkins to keep a black sports bag containing some personal items. Fallentine came to get Heidi. It appeared to Perkins that he was acting "a little strange,"[3] walking into the bedroom areas and back to the front.
¶ 6 The next day, Heidi and Fallentine ended their relationship. Both moved out of their home. Clark went to stay with friends. Approximately one month later, Perkins' home was set on fire. The house appeared to have been ransacked. The black sports bag, a credit card, and a checkbook had been stolen.
¶ 7 Perkins' missing credit card was used several times. Arson investigator Leslie O'Toole obtained surveillance videos from two of the locations, and Fallentine and Clark were filmed participating in both transactions.
¶ 8 O'Toole interrogated Clark, who claimed Fallentine set the fire. A week later, however, in the presence of his social workers Laressa Foure and Bruce Wood, Clark admitted that he set the fire. He said Fallentine wanted to retaliate against Perkins because she was "always in their business."[4] *947 Fallentine told him how to start the fire, provided gasoline, and drove him to Perkins' home. Fallentine went inside Perkins' house and took various items, left Clark there to set the fire, then returned to pick up Clark. Clark said he initially refused to participate, but he complied because he was afraid if he did not, Fallentine would kick him out of the family, and Fallentine promised to he would "hook him up"[5] with things he wanted.
¶ 9 Clark was charged with arson in the first degree. He entered a plea of guilty and was sentenced to prison. His plea agreement contained no promise to testify against Fallentine.
¶ 10 Fallentine was charged with arson in the first degree, residential burglary and possession of stolen property in the second degree. The charges were twice dismissed without prejudice pending Clark's plea. After Clark's sentencing, the State refiled the charges against Fallentine, only to discover that Clark was unwilling to testify.
¶ 11 The State argued for the admission of Clark's statements to O'Toole under the forfeiture by wrongdoing doctrine. After hearing testimony from Clark's former foster parent Barbara Kealy, social worker Laressa Fouree, and Clark himself, the court ruled that Fallentine had forfeited his right to confront Clark. The court also ruled Clark's statements were otherwise admissible.
¶ 12 The State introduced Clark's statements to O'Toole, as well as testimony that Perkins suspected Fallentine of starting the fire. Fallentine testified, and denied any involvement in the arson or burglary. He said he drove Clark to the vicinity of Perkins' home, and when he picked him up later, Clark had Heidi's bag and some credit cards. Fallentine admitted using the credit cards in various stores.
¶ 13 The jury convicted Fallentine as charged.

ANALYSIS

Forfeiture By Wrongdoing
¶ 14 The confrontation clause of the Sixth Amendment to the United States Constitution protects an accused person's right to confront the witnesses against him, including those whose testimonial statements are offered through other witnesses.[6] The right of confrontation is subject to forfeiture, however. The doctrine of forfeiture by wrongdoing operates to extinguish confrontation rights on equitable grounds, on the theory that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."[7]
¶ 15 In 2007, the Washington Supreme Court formally adopted the doctrine in State v. Mason.[8] The Court approved its application even where the wrongdoing was not committed specifically to prevent the testimony, and found no difficulty with "reflexive forfeiture,"[9] in which the charges derive from the conduct that allegedly caused the unavailability of the witness.[10] The Court held, however, that the State's evidence must be clear, cogent, and convincing.[11]
¶ 16 In 2008, the United States Supreme Court decided Giles v. California,[12] holding that out of court testimonial statements of an absent witness may be admitted at trial under the forfeiture by wrongdoing doctrine as *948 an exception to the right of confrontation, but only where the defendant's wrongful act was designed to prevent the witness from testifying.[13] Testimonial statements under the forfeiture doctrine are thus admissible only when the evidence shows the wrongdoing was intended to prevent the testimony, and the evidence is clear, cogent and convincing. Here, the trial court applied the correct legal standard in view of both Mason and Giles.
¶ 17 When the standard of proof is clear, cogent, and convincing evidence, the fact in issue must be shown to be "highly probable."[14] The standard of review is whether there is substantial evidence to support the findings in light of the highly probable test.[15] It is for the trial court, not the reviewing court, to actually weigh the evidence and determine whether it is clear, cogent and convincing.[16] Accordingly, we will not disturb findings supported by evidence which the court could reasonably have found to be clear, cogent and convincing.[17]
¶ 18 The court found that Fallentine engaged in wrongdoing intended to render Clark unavailable to testify, and that the wrongdoing did render Clark unavailable to testify. Fallentine challenges the sufficiency of the evidence to support these findings.
¶ 19 The court's decision was made in proceedings on several overlapping pretrial motions. The court first addressed whether Clark had legitimate Fifth Amendment concerns despite his plea. Eventually the court approved the State's grant of immunity. Clark continued to refuse to testify. The court imposed additional uncredited jail time as a sanction in hopes Clark would relent.
¶ 20 Meanwhile, Fallentine moved to suppress the testimony of Laressa Fourre, Clark's former social worker, and another witness as to Fallentine's influence over Clark. At a hearing on this motion, Fourre described Clark as "a follower,"[18] "a very trusting person"[19] and someone with a "low self esteem."[20] She explained that Clark "was very motivated ... by having an ongoing relationship with his sister and Mr. Fallentine. And there were many times that Anthony reported that he did not want to go back to foster care under any circumstance."[21] Fourre testified that after Clark's first interview with O'Toole, Clark told her Fallentine carried a firearm and was "no one to mess with,"[22] felt he could not get away from Fallentine, said he was afraid of Fallentine, and worried what would happen to him if Fallentine found him. When Fourre spoke to Clark after his second interview with O'Toole, he appeared "frightened, hypervigilant and somewhat paranoid."[23] Clark repeatedly told Fourre that he believed Fallentine, his family, or the Gypsy Joker motorcycle gang would retaliate against him for "roll[ing] over" on Fallentine.[24]
¶ 21 The State eventually concluded that Clark would not willingly testify against Fallentine and moved to admit his statements to O'Toole under the forfeiture by wrongdoing doctrine. A further hearing commenced. Clark was asked why he refused to testify. He denied that he was frightened, saying *949 that Fallentine is "like a brother"[25] to him and that Fallentine "didn't do the arson."[26]
¶ 22 At the conclusion of the hearing, the court ruled the State had not presented sufficient evidence to satisfy the forfeiture by wrongdoing doctrine. But the State asked to recall Fourre to testify more specifically on this issue, and the court agreed.
¶ 23 Fourre stated she had visited Clark in jail after the earlier hearing. She asked him why he would not testify against Fallentine, and Clark told her, "I can't, I can't look at Conrad in the eye and rat him out like that."[27] When asked why, he replied, "Don't you remember what happened last time I told the truth to the fire investigator ... ?"[28] Fourre understood this to be a reference to Clark's fearful response after his confession to O'Toole. Clark said, "I want to be able to walk out of here and not have to look over my shoulder all the time. I don't know what kind of connections Conrad has in here or on the outside, and I want to be able to be free of all this shit."[29] Clark also said he did not want to be seen as a snitch inside the jail "on top of everything else."[30] Fourre testified that after Clark's second interview with O'Toole, she found him on the floor in a fetal position, sobbing. He told her Fallentine had said that if Clark "rolled on him,"[31] Fallentine would have the Gypsy Jokers "put a hit" on Clark.[32]
¶ 24 On cross-examination, Fourre testified Clark could have mentioned Fallentine's family, not the Gypsy Jokers, as the source of the hit. Fourre acknowledged she had been removed from Clark's case before the fire because Clark had said he had a grudge against her and that he and Fallentine had looked up her home address. Fourre also acknowledged that the new social worker, Bruce Wood, had had Clark telephone Fallentine a few weeks after the arson interviews, and that Fallentine said there was no hit on Clark.
¶ 25 Based upon Fourre's testimony, the court ruled that Clark's recorded statements to O'Toole were admissible under the doctrine of forfeiture by wrongdoing.
¶ 26 Fallentine identifies various reasons to discredit Fourre's testimony, including the fact she did not describe a threat in her original testimony. But Fourre's original testimony had a different focus, and she was not asked specifically about threats. Fallentine's complaints relate to Fourre's credibility, which is exclusively the province of the trial judge. Viewed in the light most favorable to the State,[33] the evidence shows Fallentine told Clark if Clark testified against him, he would be killed, and that threat actually prevented Clark from testifying.
¶ 27 The court did not err in admitting Clark's hearsay statements under the forfeiture by wrongdoing doctrine.[34]

Perkins' Testimony
¶ 28 Fallentine challenges the admission of Perkins' testimony that she suspected Fallentine in the arson. We review evidentiary rulings under the abuse of discretion standard.[35]
*950 ¶ 29 Under Evidence Rule 701, a witness may testify to opinions or inferences when they are rationally based on the perception of the witness and helpful to the jury. "Where the opinion relates to a core element that the State must prove, there must be a substantial factual basis supporting the opinion."[36]
¶ 30 Perkins had personal knowledge of Fallentine's resentments toward her and the fact that a bag containing personal items belonging to Fallentine's wife had disappeared in the burglary and arson. She had watched Fallentine act suspiciously in her house. Her suspicions were rationally related to that knowledge. That Perkins suspected Fallentine helped to explain the course of the investigation. But even if the testimony was technically improper, an evidentiary error is reversible only if "`within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'"[37] Here, a rational juror would have arrived at the same suspicion expressed by Perkins. Further, the other evidence implicating Fallentine  the theft of Heidi's bag, the statements of Clark, the testimony of the clerks at various stores where the stolen credit card was used, the surveillance tapes from the AM/PM market and the Fred Meyer store, and Fourre's and O'Toole's testimony  combined to present a very strong case of Fallentine's guilt. Any error was harmless.

O'Toole's Testimony
¶ 31 Fallentine also contends O'Toole should not have been permitted to testify that Perkins suspected Fallentine. The State responds that O'Toole's testimony was admitted for the legitimate purpose of describing the course of his investigation. O'Toole testified to the procedure for investigating an intentionally set fire, which includes asking the victim who might have a motive to commit arson against them. Describing this procedure does not require quoting out of court statements of others. But like Perkins' testimony to the same effect, the underlying facts all were admissible, and point to the same conclusion. Any error was harmless.

Jury Instruction
¶ 32 Fallentine next challenges jury instruction 10, which instructed the jury:
To convict the defendant of the crime of arson in the first degree, as charged in count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about the 11th day of February, 2005, the defendant or his accomplice caused a fire or explosion;
(2) That the fire or explosion damaged a dwelling;
(3) That defendant acted knowingly and maliciously; and
(4) That the acts occurred in the [s]tate of Washington.[38]
Our review is de novo.[39]
¶ 33 Fallentine argues that the phrase "or his accomplice" constituted an impermissible judicial comment on the evidence in violation of article IV, section 16 of the Washington Constitution, because the reasonable inference for the jury to draw was that the court believed Fallentine was the principal and Clark acted at Fallentine's direction. The phrase "or an accomplice" has the approval of the Washington Supreme Court.[40] Fallentine argues that the pronoun *951 "his" introduces a new element, presupposes that Fallentine had an accomplice, and suggests the court's opinion of his guilt.
¶ 34 We disagree with Fallentine's parsing of the language. First, the State's theory, which it repeatedly stated to the jury, was that Clark was the principal in the arson and Fallentine the accomplice. The instructions correctly stated the law. It was undisputed that Clark set the fire, and the jury was informed Clark had been convicted of the arson. Nothing in this scenario supports Fallentine's suggestion that from a single pronoun, the jury would have believed the trial judge was communicating a belief contrary to the State's theory, the evidence, and the instructions.
¶ 35 Affirmed.
WE CONCUR: LAU and GROSSE, JJ.
NOTES
[1] Heidi Fallentine will be referred by her first name, to avoid confusion with the defendant, Conrad Fallentine.
[2] Report of Proceedings (RP) (May 7, 2007) at 42.
[3] Id. at 44.
[4] RP (May 8, 2007) at 240.
[5] Id.
[6] Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
[7] Davis, 547 U.S. at 833, 126 S.Ct. 2266 (citing Crawford, 541 U.S. at 62, 124 S.Ct. 1354).
[8] 160 Wash.2d 910, 925, 162 P.3d 396 (2007).
[9] See id. at 926-27, 162 P.3d 396.
[10] Id. at 940, 162 P.3d 396 (Sanders, J., dissenting). Although Fallentine argues that his is a case of reflexive forfeiture, it is not so; Fallentine is not charged with witness tampering, which would be the appropriate charge for the conduct that allegedly caused Clark's unavailability, but with arson, burglary, and possession of stolen property.
[11] Id. at 926-27, 162 P.3d 396.
[12] ___ U.S. ___, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008).
[13] Id. at 2683, 2688. Thus, Giles overrules Mason to the extent Mason holds that a specific intent to prevent testimony is not required to apply the forfeiture doctrine.
[14] Douglas Northwest, Inc. v. Bill O'Brien & Sons Const., Inc., 64 Wash.App. 661, 678, 828 P.2d 565 (1992).
[15] Id.
[16] Bland v. Mentor, 63 Wash.2d 150, 154, 385 P.2d 727 (1963); Colonial Imports v. Carlton Northwest, Inc., 83 Wash.App. 229, 238, 921 P.2d 575 (1996).
[17] In re LaBelle, 107 Wash.2d 196, 209, 728 P.2d 138 (1986).
[18] RP (Mar. 19, 2007) at 115.
[19] Id. at 140.
[20] Id. at 114.
[21] Id. at 140.
[22] Id. at 120.
[23] Id. at 127.
[24] Id. Fallentine's father was allegedly a member of the Gypsy Jokers, and Fallentine himself was allegedly a fledgling member.
[25] RP (Apr. 2, 2007) at 7.
[26] Id. at 21.
[27] RP (Apr. 30, 2007) at 57.
[28] Id.
[29] Id. at 57-58.
[30] Id. at 91.
[31] Id. at 65.
[32] Id. at 68.
[33] State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992).
[34] Fallentine concedes that a finding of forfeiture by wrongdoing prohibits a challenge to the admissibility of statements on hearsay as well as confrontation grounds. See Giles, 128 S.Ct. at 2686. For the first time in his reply brief, Fallentine contends Giles leaves open the question of whether unreliable testimony, excludable on due process grounds, may be introduced by virtue of an accused person's act of wrongdoing. We decline to address this argument. See State v. Johnson, 119 Wash.2d 167, 170, 829 P.2d 1082 (1992).
[35] State v. McDonald, 138 Wash.2d 680, 693, 981 P.2d 443 (1999). An abuse of discretion is found if the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law. Mayer v. Sto Indus., Inc., 156 Wash.2d 677, 684, 132 P.3d 115 (2006).
[36] State v. Farr-Lenzini, 93 Wash.App. 453, 462-63, 970 P.2d 313 (1999).
[37] State v. Brockob, 159 Wash.2d 311, 351, 150 P.3d 59 (2006) (quoting State v. Bourgeois, 133 Wash.2d 389, 403, 945 P.2d 1120 (1997)).
[38] Clerk's Papers at 95 (emphasis added).
[39] State v. Levy, 156 Wash.2d 709, 720, 132 P.3d 1076 (2006).
[40] State v. Teal, 152 Wash.2d 333, 336 n. 3, 96 P.3d 974 (2004). See also 11 Washington Pattern Jury Instructions Criminal, WPIC 26.04, at 366 (2008) ("To convict the defendant of the crime of murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:. ... (2) That [the defendant] [or] [an accomplice] caused the death.") (alteration in original).