**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54152-1-II |
| Respondent, | |
| v. | |
| ISKANDER NURIYEV, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Iskander Nuriyev appeals his convictions and sentence for second degree assault–domestic violence, felony harassment, and intimidating a witness. The victim did not testify at trial, but the trial court admitted the victim's prior out-of-court statements under the forfeiture by wrongdoing doctrine. Nuriyev argues that the trial court erred and violated his Sixth Amendment rights when it admitted the victim's out-of-court statements, and when it conducted a pre-trial hearing without an interpreter. We hold that the trial court erred when it admitted the victim's out-of-court statements to the police officer, but we hold that this error was harmless. We do not reach Nuriyev's second argument because he argues it for the first time on appeal. Accordingly, we affirm.

FACTS

I. BACKGROUND

In April 2019, Iskander Nuriyev and the victim, N.S., had been in a relationship for more than four years. In the early morning hours of April 7, Nuriyev was at N.S.'s home. Nuriyev

was drunk and became combative when N.S. attempted to pour out the vodka he was drinking. Nuriyev hit her and grabbed her by the neck. He strangled, slapped, and punched her; pulled her hair; and kicked her repeatedly while she was on the floor. This assault caused a concussion, bruises all over N.S's body, and bleeding in her left ear. N.S. fled her home.

At around 4:00 AM on April 7, N.S.'s neighbor Andrey Koptelev responded to N.S. ringing his doorbell. N.S. asked Koptelev to let her in, and she collapsed on the floor in tears. N.S.'s face was swollen, and she told Koptelev to let her in or "'he'll kill me.'" Verbatim Report of Proceedings (VRP) at 57-58. N.S. told Koptelev's wife, Natalia Babiy, that N.S.'s boyfriend was beating her, and that she had tried earlier to escape to a nearby fire station. N.S. also told Babiy that she had urinated herself while trying to escape because of how hard Nuriyev was holding her.

When Koptelev told N.S. to call the police, she refused. N.S. told Babiy she was scared Nuriyev would kill her if she called police. After N.S. refused to call the police, Koptelev drove to the police station to file a report. Koptelev said that N.S. did not want to be the person who filed a police report. Babiy offered to take N.S. to the hospital because N.S. could not hear from one ear, but N.S. refused. After several hours, Babiy took N.S. to N.S.'s sister's house.

Officer Porter and other police officers stopped Nuriyev's vehicle as it was leaving N.S.'s residence on April 7. Porter observed a recent injury to Nuriyev's middle finger knuckle, and he photographed the injury. The police officers arrested Nuriyev.

N.S. eventually went to the emergency room (ER) on April 7 for multiple injuries to her head, face, neck, chest, and extremities. N.S. reported to the ER staff that her boyfriend strangled, slapped, and punched her repeatedly in the face, chest, and stomach, then pulled her

2

hair, threw her on the floor, and kicked her repeatedly. ER doctor Audrey Collins-Watson noted injuries consistent with this report. Dr. Collins-Watson diagnosed ruptured capillaries and linear markings across N.S.'s throat consistent with "assault by a manual strangulation;" scalp trauma; contusions to her scalp, face, elbows, knees, forearms, and chest wall; and a strained neck. Dr. Collins-Watson further diagnosed N.S. with a concussion, blood in her left ear canal, and vertigo consistent with an inner ear injury.

N.S. told the ER nurse that the incident had occurred in her home, and that she had escaped to her neighbors' house. N.S. told hospital staff that she did not want to talk to police because Nuriyev told her that he would kill her if she told anyone that he hurt her. N.S. told Dr. Collins-Watson and the ER nurse that Nuriyev would "finish [her] up" and told the ER nurse that he was "dangerous." VRP at 148, 179.

Vancouver Police Officer James Porter also responded to N.S. in the ER. He observed that N.S. had swelling to her face and ear and that she was grimacing in pain. Officer Porter took several photographs of N.S.'s injuries.

On April 17, N.S. saw Dr. Adam Wilson, an ear, nose, and throat surgeon. N.S. reported hearing loss, pain, and dizziness. Dr. Wilson diagnosed N.S. with a hole to her left eardrum consistent with blunt force trauma.

## II. STATE'S PRETRIAL MOTION TO ADMIT TESTIMONIAL STATEMENTS

The State charged Nuriyev with first degree kidnapping, second degree assault, felony harassment, and intimidating a witness, all with domestic violence designations. Before trial, the State amended the information to include an aggravator that the victim's injuries substantially exceeded the level of bodily harm necessary to satisfy the elements of second degree assault.

The State subpoenaed N.S. to appear at trial.[1] However, N.S. told a State-appointed advocate and Officer Porter that she was afraid to testify and would not appear.

A.      *State's Motion to Admit N.S.'s Out-of-Court Statements to Police*

The State filed a motion to admit N.S.'s out-of-court testimonial statements made to Officer Porter through the doctrine of forfeiture by wrongdoing. The State argued that Nuriyev had waived his right to confront N.S. because his threats and assault prevented her from seeking help, and his and his family's statements to her made her fear testifying at trial. To support its motion, the State presented testimony from Officer Porter regarding his contact with N.S.

B.      *Officer Porter's Pretrial Testimony*

Officer Porter testified at a pretrial hearing on October 13, 2019. Nuriyev appeared at the hearing without an interpreter but was represented by counsel.[2] Officer Porter testified that he had contacted N.S. the night before the hearing to determine if she planned to show up for trial. The State questioned Porter:

Q. Okay. And did she express reservations in regard to testifying in this matter?

A. Yes.

Q. What did she say about that?

A. Her concern was repercussions of coming to trial. Her statements to me were, "If I come to trial and he's found innocent, that's going to be an issue for me." And that if she doesn't come to trial and he's found innocent it will look better for me.

---

[1] The State subpoenaed N.S. twice, once in April 2019, and again in October.

[2] The State addressed the interpreter issue at the pretrial hearing stating, "Your Honor, I wanted to clarify one thing. I think the defendant has had an interpreter at some of the hearings, and I don't know if he's asking for an interpreter at trial. And then I think that potentially at least one of the State's witnesses might need a Russian interpreter." VRP at 21.

4

Q. And did she express any fear of the defendant during your phone call last night, or what would happen?

A. Yes, of being killed.

Q. And did she indicate whether or not she had received any pressure from outside sources regarding testifying in this matter?

A. She stated that she had received phone calls from his family to not come to trial.

Q. Okay. And did she indicate–did she at any point recant the allegations to you–

A. No.

Q. –that she originally made?

A. No.

Q. And did she express a desire to proceed, but just reluctance based on fear?

A. Correct.

VRP at 6-7.

The following exchange took place on cross-examination:

Q. And did you verify–did you contact Mr. Nuriyev's family and make contact with them about these allegations?

A. No, ma'am.

Q. So, you have no independent information as to where this information came from other than what [N.S.] gave you?

A. Correct.

Q. And have you had contact with her previously, [N.S.]?

A. I've had contact twice before this phone conversation.

Q. Okay. And the first time was April 7th, the date of the alleged incident?

A. Yes.

Q. And then what other date; do you recall?

. . .

A. I think it's the second day.

Q. Okay. Like the 8th or 9th of April?

A. Correct.

Q. And since then you haven't had any contact from her?

A. No.

Q. She's made no contact with you regarding any fear that she may have?

A. It's all done through the PA[3] and the advocate. I don't have any–

Q. I'm just asking you specifically, if you can answer it. Has she contacted you specifically and indicated that she was fearful or that she didn't want to testify?

A. She has not reached out to me, no.

VRP at 7-8.

The trial court admitted N.S.'s out-of-court statements to Officer Porter under the forfeiture by wrongdoing doctrine. In its oral ruling, the trial court stated that it looked at "the totality of the circumstances" and noted that domestic violence cases "[don't] always come in a prepackaged and preset template." VRP at 16. The trial court stated it made its finding based on "clear, cogent, and convincing evidence," but made no other findings, other than to state that "there may or may not have been some physical violence" during the long-term relationship. VRP at 15-16.

---

[3] From the context in the record, it appears Officer Porter was referring to the Prosecuting Attorney.

C.       *Injuries Exceeding Substantial Bodily Harm Aggravator*

At the same hearing, the State filed an amended information adding the aggravating circumstance that N.S.'s injuries substantially exceeded the level of bodily harm necessary to constitute second degree assault. Nuriyev's counsel explained the amendment to Nuriyev:

> [COUNSEL]: Everything else stays the same, but there is an additional aggravator. The additional language here is that the victim's injuries exceed the level of bodily harm necessary to satisfy the elements of assault two. So, that is an aggravator. It's not a new charge, but it's an additional aggravator. Do you want the Court to read it out into the record or do you understand it?
>
> [NURIYEV]: I don't really understand it.

VRP at 19-20. The trial court then read the full count for second degree assault, including the added aggravator language. The trial court asked Nuriyev, "Do you need a full reading of all the other counts as well? That's the only one that's changed." VRP at 21. Nuriyev's counsel responded:

> [COUNSEL]: He understands. We've gone over them. He understands the other counts.
>
> THE COURT: Pleading not guilty as charged in the Amended Information then?
>
> [COUNSEL]: He's pleading not guilty; continuing with a not-guilty plea.

VRP at 21.

## III. TRIAL

The trial proceeded on November 18. N.S. did not appear. Nuriyev moved for a continuance the day of trial. Nuriyev's counsel argued that because Nuriyev did not have an interpreter at the forfeiture hearing, he did not understand that they had called the case ready for

trial, and Nuriyev was waiting for his brother to provide him some documents. Counsel also stated that Nuriyev wanted a new attorney.

The State responded that it had asked for a continuance on October 10, and that Nuriyev objected at that time and wanted to proceed. The trial court denied the motion for a continuance.

A.    *Testimony Presented by the State*

Koptelev and Babiy, testified as detailed above. Part I, *supra*. Koptelev identified Nuriyev as N.S.'s boyfriend.

Dr. Collins-Watson, Dr. Wilson, as well as an ER nurse testified as described above. Part I, *supra*. Additionally, Dr. Collins-Watson also testified that urination can occur during strangulation. Dr. Collins-Watson explained that N.S.'s symptoms were consistent with a report of strangulation and that strangulation can cause abnormalities due to cutting off blood flow to the brain.

Officer Porter testified as described above. Part I, *supra*. He also testified that N.S. told him Nuriyev arrived at her house at around 2:00 AM on the morning of April 7. She reported that Nuriyev's shirt was ripped and he appeared as if he had just gotten into a fight. She said that he was intoxicated and requested vodka. She told Officer Porter that Nuriyev requested juice for his vodka, but they had none, so she drove to a nearby grocery to get more juice and returned home, where Nuriyev continued to drink. N.S. reported that at one point she poured out Nuriyev's vodka, which was when he began beating her.

Officer Porter also testified that N.S. told him she escaped from the house and began running toward a nearby fire station to call for help. She said that Nuriyev caught up with her and started dragging her back to the house. She stated that when she would attempt to flag down

passing cars, he would punch her. Officer Porter quoted N.S. as saying, "'I literally thought I was going to die. I was scared for my life.'" VRP at 89. She told Officer Porter that Nuriyev made a gun sign with his fingers and threatened to kill her and her family if she called the police.

N.S. told Officer Porter that on returning to the house, Nuriyev continued to beat her, and he strangled her against the wall until she urinated herself. After that, she was able to leave the house and flee to her neighbors' home.

Officer Porter testified that during his interview with N.S., she expressed concern talking to the police and stated that "'[i]f [Nuriyev] gets out, he's gonna kill me.'" VRP at 92. N.S. also completed and signed a *Smith* affidavit.[4] Officer Porter read the affidavit, which described Nuriyev's actions on April 7:

> He came to my house at around two a.m., drunk and [under] some other influence. I asked him to leave and he wouldn't. Started arguments and slapping me on the face for no reason. I tried to run out and scream, run down the street, Andresen and 63rd, towards the fire station. He came after me and I told him to walk home—he came after me and told me to walk home with him. When we got home he continued hitting me on the face and my head multiple times, punching me all over and throwing across the room, pulling me by hair and putting his hands around my neck. He was very angry and yelled at me all this time. He also punched me in the belly and all over with his feet. I lost hearing in my left ear from him hitting me many times. Also, shook me a few times and pulled my hair. I thought I was gonna die there. My head was exploding from pain and dizziness. I peed my pants from fear of him killing me. I tried to escape a few times in the garage and outside, but he took my car keys and my phone. After all this, I escaped through an open door somehow and ran to my neighbors in one shoe. Neighbors let me in, Nataliya and Andrey. Nataliya let me stay till eight or so. Then she took me to my sister. They saw my condition and were very afraid for me. I did tell them what happened and I was afraid for my life. They saved my life.

VRP at 96-97.

---

[4] A *Smith* affidavit satisfies the oath requirement of ER 801(d)(1) and may be admissible where a victim testifies at trial and makes statements inconsistent with his or her affidavit. *See State v. Smith*, 97 Wn.2d 856, 860-62, 651 P.2d 207 (1982).

The trial court also admitted the photos Officer Porter took of N.S.'s injuries, and Officer Porter described them to the court.

Officer Porter testified that he contacted N.S. the week before trial to determine if she would come to trial. Officer Porter said that she stated, "'If I come to trial and he's found not guilty, then I'm gonna be [in] trouble. And if I come to trial and he's—if I don't come to trial and he's guilty, it will look better for me.'" VRP at 108. Officer Porter further testified that he spoke to N.S. on the day of trial and she said she was too scared to appear and testify.

B.     *Nuriyev's Testimony*

Nuriyev also testified. He stated that he had been at N.S.'s house on the evening of April 6 before leaving to go to a wedding. Nuriyev stated he returned after midnight in a "bad mood" and wanted to get drunk. VRP at 206, 217. He stated that N.S. left at one point to go to the grocery store but returned. He denied that she had fled towards the fire station and also denied forcing her to return to her home. He admitted that he hit N.S., but denied threatening her or her family.

When asked if he put his hands around N.S.'s neck, Nuriyev responded, "Her neck, something—I got ahold of something. It was rather her clothes, and I kind of pushed her away from me." VRP at 213. On cross-examination, Nuriyev admitted to sending N.S. a text around 9:00 PM on April 6 saying that he was looking for a fight and to "beat their heads." VRP at 216-18. He admitted that he became angry when N.S. poured out his vodka and that he then hit her. He stated that he hit her several times on her face.

Nuriyev explained that he had tried to take the vodka bottle away from N.S. when he accidentally hit her with the bottle, but that he continued to hit her with his hands afterwards.

When asked if he applied pressure to her neck with his hands, Nuriyev responded, "I was just grabbing her trying to open the door, so while I was holding her trying to open the door, I kind of pushed her away and that's why–while I was trying to hold the door, perhaps that was when I caused those marks." VRP at 227. He denied kicking N.S. or bruising her legs but admitted that she "might have fallen." VRP at 227-29.

C.      *Verdicts and Sentence*

The jury found Nuriyev not guilty of first degree kidnapping. However, the jury found Nuriyev guilty of second degree assault, felony harassment, and intimidating a witness. The jury also returned special verdicts finding that N.S.'s injuries substantially exceeded the level of bodily harm necessary to constitute substantial bodily harm, and that Nuriyev and N.S. were members of the same family or household. The trial court sentenced Nuriyev to an exceptional sentence of 55 months confinement. Nuriyev appeals.

ANALYSIS

I. FORFEITURE BY WRONGDOING

Nuriyev argues that the trial court erred when it admitted N.S.'s hearsay testimony under the forfeiture by wrongdoing doctrine. We agree. However, we hold that this error was harmless beyond a reasonable doubt.

A.      *Legal Principles*

Our Supreme Court adopted the forfeiture by wrongdoing doctrine in 2007, in *State v. Mason*, 160 Wn.2d 910, 925, 162 P.3d 396 (2007). Under the forfeiture by wrongdoing doctrine, an absent witness's hearsay statement may be admitted at trial where the defendant's wrongdoing prevented the testimony. *Mason*, 160 Wn.2d at 926. In 2008, the U.S. Supreme

11

Court held that a trial court may admit out-of-court testimonial statements from an absent witness as an exception to the right of confrontation, but only where the defendant intended to prevent that witness from testifying. *Giles v. California*, 554 U.S. 353, 361, 377, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008). Our court recognized the State's obligation to prove the defendant's intent in *State v. Dobbs*, 180 Wn.2d 1, 11, 320 P.3d 705 (2014).

A challenge to hearsay testimony admitted under the forfeiture by wrongdoing doctrine is a Sixth Amendment confrontation issue that we review de novo. *Dobbs*, 180 Wn.2d at 10. Where the confrontation issue relates to admissibility of evidence, we review the trial court's admission of evidence for an abuse of discretion. *Dobbs*, 180 Wn.2d at 10; *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). "A trial court abuses its discretion when its decision 'is manifestly unreasonable or based upon untenable grounds or reasons.'" *Dobbs*, 180 Wn.2d at 10 (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).

Under the forfeiture by wrongdoing doctrine, "a defendant forfeits the Sixth Amendment right to confront a witness when clear, cogent, and convincing evidence shows that the witness has been made unavailable by the wrongdoing of the defendant, and that the defendant engaged in the wrongful conduct with the intention to prevent the witness from testifying." *Dobbs*, 180 Wn.2d at 11. Under the clear, cogent, and convincing evidence standard of proof, the fact at issue must be shown to be "'highly probable'" but need not be beyond a reasonable doubt. *Dobbs*, 180 Wn.2d at 11, 16 (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

The forfeiture by wrongdoing doctrine is not limited to direct acts of wrongdoing by a defendant. *State v. Hernandez*, 192 Wn. App. 673, 682, 368 P.3d 500 (2016) (citing

*Giles*, 554 U.S. at 359-61). It also includes instances where a defendant "uses an intermediary for the purpose of making a witness absent." *Giles*, 554 U.S. at 360.

B.      *Clear, Cogent, and Convincing Evidence of Intent*

Nuriyev argues that the trial court erroneously applied the forfeiture by wrongdoing doctrine because it did not make the requisite finding that Nuriyev engaged in wrongful conduct with the intent to prevent N.S. from testifying at trial.[5]  We agree.

As an initial matter, we address the standard the State must meet under the forfeiture by wrongdoing doctrine.  The State argues that it has no burden to show that Nuriyev threatened N.S. with the intent to prevent her testimony.  And indeed that was the standard under *Mason*. 160 Wn.2d at 926.  However that standard was changed following *Giles*, which held that forfeiture occurs only when clear, cogent, and convincing evidence shows the witness was made unavailable by the wrongdoing of the defendant, and the defendant *intended* to prevent the witness form testifying.  *Dobbs*, 180 Wn.2d at 11.  Thus, the State must show by clear, cogent, and convincing evidence that is was highly probable that Nuriyev threatened N.S. with the intent to prevent her from testifying.  It does not do so here.

Here, the trial court erred because it did not make the required findings based on clear, cogent, and convincing evidence that N.S. was made unavailable by Nuriyev's wrongdoing and that Nuriyev intended to prevent her from testifying.  Instead, the trial court made cursory findings based on "the totality of the circumstances" and made no specific ruling on how the

---

[5] Nuriyev also argues that the State did not make a good faith effort to obtain N.S.'s presence at trial.  He argues that the State should have sought a material witness warrant.  Because we hold that the trial court erred in admitting the statements on other grounds, we do not consider this argument.

evidence showed Nuriyev acted with intent to prevent N.S.'s testimony. Moreover, even if the trial court had made the required findings, insufficient evidence was admitted at the hearing to support them.

Both parties rely on *Dobbs*, 180 Wn.2d 1. Nuriyev cites *Dobbs* to argue that the State must prove by clear, cogent and convincing evidence that he intended to prevent N.S. from testifying. The State argues that under *Dobbs*, the crime for which a defendant is arrested may provide sufficient evidence that a defendant forfeited his right to confrontation. We agree with Nuriyev.

In *Dobbs*, the defendant engaged in a series of violent and threatening actions against his ex-girlfriend. 180 Wn.2d at 4-5. Police responded to the victim's residence for a domestic violence call. *Dobbs*, 180 Wn.2d at 5. The victim informed police that Dobbs had been following her and threatening to shoot her, and that he was banging on her door. *Dobbs*, 180 Wn.2d at 5. When Dobbs left, the victim discovered her tires slashed. *Dobbs*, 180 Wn.2d at 5. Police were at the victim's residence later when she received a phone call where Dobbs argued with her about her calling the police and warning her that she was going to "get it." *Dobbs*, 180 Wn.2d at 6. Several days later, the victim's neighbor observed Dobbs in a car next to the victim's house and heard gunshots. *Dobbs*, 180 Wn.2d at 6. Police found bullet holes in the victim's house. *Dobbs*, 180 Wn.2d at 6. Later that same day, the victim's neighbor spotted Dobbs on her property with a gun. *Dobbs*, 180 Wn.2d at 6. Police responded and arrested Dobbs. *Dobbs*, 180 Wn.2d at 7. Dobbs left the victim a voicemail after he was arrested in which he pleaded with her not to press charges and then used threatening language. *Dobbs*, 180 Wn.2d at 7.

Dobbs's victim did not appear at trial, despite a subpoena. *Dobbs*, 180 Wn.2d at 8. The trial court admitted the victim's out-of-court statements, ruling Dobbs had forfeited his confrontation right by wrongdoing. *Dobbs*, 180 Wn.2d at 8-9. On appeal, our Supreme Court followed *Giles*, and explained that the State's showing by clear, cogent, and convincing evidence that the defendant made the witness unavailable must include "that the defendant engaged in the wrongful conduct with the intention to prevent the witness from testifying." *Dobbs*, 180 Wn.2d at 11. The *Dobbs* court affirmed, holding that the State established a "pattern of abuse and intimidation" toward the victim and shown it was "highly probable" that the violent threats caused her absence from trial. *Dobbs*, 180 Wn.2d at 11-12.

Nuriyev also cites *State v. Fallentine*, 149 Wn. App. 614, 215 P.3d 945 (2009), and *Hernandez*, 192 Wn. App. 673, 682, to further distinguish the facts here. In *Fallentine*, the court held that statements made by a witness, Clark, were properly admitted under the forfeiture by wrongdoing doctrine. 149 Wn. App. at 623. After an arson, a fire investigator questioned Clark, who stated that Fallentine set the fire. *Fallentine*, 149 Wn. App. at 617-18. After Clark was interviewed by the arson investigator, a State social worker found him in the fetal position, sobbing. *Fallentine*, 149 Wn. App. at 623. Clark recanted and said that he set the fire. *Fallentine*, 149 Wn. App. at 618. Clark told the social worker that he could not testify against Fallentine or else Fallentine, his family, or members of his motorcycle gang would retaliate. *Fallentine*, 149 Wn. App. at 621-22. Clark told her that Fallentine told Clark that if he "rolled on him," Fallentine would have the motorcycle gang "put a hit" on Clark. *Fallentine*, 149 Wn. App. at 623. Clark refused to testify, and the trial court admitted his statements. *Fallentine*, 149 Wn. App. at 618.

15

In *Fallentine*, the State produced clear, cogent, and convincing evidence that Fallentine directly threatened Clark with death if he testified. 149 Wn. App. at 620, 623. Such is not the case here.

In *Hernandez*, 192 Wn. App. at 676, Division I held that the trial court had appropriately admitted out-of-court statements under the forfeiture doctrine. There, a child told her teacher that her stepfather had been sexually abusing her. *Hernandez*, 192 Wn. App. at 676. The child repeated these allegations to three school officials. *Hernandez*, 192 Wn. App. at 677. The State arrested and charged Hernandez with child rape and molestation. *Hernandez*, 192 Wn. App. at 677. When Hernandez filed a motion to compel interviews with the witnesses, the State could not find the family. *Hernandez*, 192 Wn. App. at 677-79. The State discovered that the child and mother were in Mexico. *Hernandez*, 192 Wn. App. at 678. Despite a no-contact order, the State discovered that Hernandez had made more than 150 telephone calls to the child's mother from jail in which he told the mother to get the family out of the United States. *Hernandez*, 192 Wn. App. at 679, 682-86. The trial court admitted the victim's statements to her teacher and other school officials. *Hernandez*, 192 Wn. App. at 680. Division I of this court affirmed, holding that the State proved by clear, cogent, and convincing evidence that Hernandez and his wife conspired to remove the victim from the country, thus preventing her from testifying. *Hernandez*, 192 Wn. App. at 686.

Here, although there is evidence that Nuriyev attempted to stop N.S. from initially reporting the assault to the police, there was not clear, cogent, and convincing evidence that Nuriyev took any action with the intent to prevent N.S. from testifying at *this trial*.[6]

The trial court made no finding and there was no evidence presented in the trial court to allow the court to find it highly probable that any of Nuriyev's actions were intended to prevent N.S. from *testifying*. Each of the above cases contains this critical element that is not present here: clear, cogent and convincing evidence of the defendant's intent to prevent the witness from testifying. In *Dobbs*, the State not only presented evidence of Dobbs's violent behavior, the evidence showed that police heard Dobbs threaten the victim against testifying. 180 Wn.2d at 6. In *Fallentine*, the defendant directly threatened Clark with a "hit" by a motorcycle gang. 149 Wn. App. at 623. And in *Hernandez*, the defendant made scores of telephone calls from jail to the victim's mother, intimating that the family should move to Mexico. 192 Wn. App. at 679, 682-86. In each case, the defendant took some action with the aim of preventing a witness from testifying at trial. And in the case of *Hernandez,* there was a clear nexus between the defendant and a third party's action to remove the witness from the country. *Hernandez*, 192 Wn. App. at 679, 682-86. Such evidence was absent here.

Regarding the alleged phone calls from Nuriyev's family, it is true that a defendant may waive his confrontation rights through an intermediary who acts to make a witness absent. *Giles*,

---

[6] To hold otherwise would significantly erode a defendant's right of confrontation. Taking Nuriyev's argument to its logical conclusion, a victim's fear of testifying based solely on a defendant's attempt to keep a victim from reporting a crime to law enforcement could form the basis of a "waiver" of the defendant's Sixth Amendment rights. We note that it is a common occurrence for perpetrators to urge or threaten victims to not call the police. As our Supreme Court stated in *Mason*, "[T]he right of confrontation should not be easily deemed forfeited by an accused." 160 Wn.2d at 927.

554 U.S. at 360. Additionally, the forfeiture doctrine is not limited to wrongdoing by violent means. *See Dobbs*, 180 Wn.2d at 4. However, an intermediary's actions, without more, cannot waive a defendant's confrontation rights. *See Hernandez*, 192 Wn. App. at 682-86; *see also State v. Brownlee*, 18 Wn. App. 2d 1, 492 P3.d 866 (2021).[7] Although Officer Porter testified at the pretrial hearing that N.S. stated she received calls from Nuriyev's family "to not come to trial," there is nothing in the record to show that Nuriyev directed his family to contact N.S. VRP at 6. The evidence produced in the trial court simply does not make it highly probable that Nuriyev directed his family to try to prevent N.S. from testifying.[8]

In conclusion, although it may be highly probable that Nuriyev's actions instilled a fear in N.S. to the extent that she did not testify at trial, there is nothing in the record from which to draw a clear inference that any of Nuriyev's actions were intended to prevent her from testifying in this trial. Accordingly, we hold that the trial court abused its discretion when it admitted Officer Porter's testimony containing N.S.'s out-of-court statements because clear, cogent, and convincing evidence does not support a finding that Nuriyev intended to prevent N.S. from appearing at trial.

C.      *Constitutional Harmless Error*

The State alternatively argues that if we hold that the trial court erred, such error was harmless. We agree.

---

[7] In *Brownlee*, 18 Wn. App. 2d at 6, the defendant made multiple phone calls from jail to ask them to "fix" his situation and ensure his victim did not testify at trial.

[8] It is critical that the State must establish Nuriyev's involvement in the alleged phone calls. It is Nuriyev who must waive his constitutional right to confrontation; his family's actions, without more, cannot waive these rights on Nuriyev's behalf.

We conduct constitutional harmless error analysis for confrontation clause errors. *State v. Jasper*, 174 Wn.2d 96, 117, 271 P.3d 876 (2012). We use the "overwhelming untainted evidence" test and look only to the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985); *State v. Fraser*, 170 Wn. App. 13, 24, 282 P.3d 152 (2012). The State bears the burden of proving the error was harmless. *Guloy*, 104 Wn.2d at 425. To find a constitutional error harmless, we must therefore conclude that any reasonable jury would have reached the same result. *State v. DeLeon*, 185 Wn.2d 478, 487, 374 P.3d 95 (2016).

### 1. *Domestic Violence Designation*

As an initial matter, to prove the domestic violence finding, which applies to each crime here, the State must prove that the defendant and victim were "household members," which includes people who have had a dating relationship. RCW 9A.36.041; *see also* RCW 9.41.040; RCW 10.99.020; VRP at 286. Here, Nuriyev admitted that he and N.S. were in a relationship. Koptelev also identified Nuriyev as N.S.'s boyfriend. Thus, there was overwhelming evidence to prove this designation and any reasonable jury would have reached the same result.

### 2. *Second Degree Assault*

To convict Nuriyev of second degree assault, the State was required to prove that Nuriyev "intentionally assault[ed] another and thereby recklessly inflict[ed] substantial bodily

19

harm; or . . . assault[ed] another by strangulation or suffocation."[9] RCW 9A.36.021(1)(a), (g).

"'Substantial bodily harm' means bodily injury which involves a temporary but substantial

disfigurement, or which causes a temporary but substantial loss or impairment of the function of

any bodily part or organ, or which causes a fracture of any bodily part."[10] RCW

9A.04.110(4)(b). "'Strangulation' means to compress a person's neck, thereby obstructing the

person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's

blood flow or ability to breathe." RCW 9A.04.110(26). To prove the aggravating

circumstances, the State was required to prove that the victim's injuries substantially exceeded

those required to constitute substantial bodily harm under RCW 9A.36.021. RCW

9.94A.535(3)(y).

---

[9] Jury Instruction no. 16A said:

> To convict the defendant of the crime of assault in the second degree, each of the following two elements of the crime must be proved beyond a reasonable doubt: (1) That on or about April 7, 2019, the defendant: (a) intentionally assaulted [N.S.] and thereby recklessly inflicted substantial bodily harm; or (b) intentionally assaulted [N.S.] by strangulation; and (2) That this act occurred in the State of Washington. If you find from the evidence that element (2) and either alternative element (1)(a) or (1)(b) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

VRP at 279.

[10] Jury instruction no. 14 said:

> Substantial bodily harm means bodily injury that involves a temporary but substantial disfigurement, or that causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part. The term 'substantial' signifies a degree of harm that is considerable in amount, value, or worth and requires a showing greater than an injury merely having some existence.

VRP at 279.

Here there was overwhelming untainted evidence proving each element. First, Nuriyev admitted to assaulting N.S. When asked if he choked her, Nuriyev replied, "Her neck, something—I got ahold of something." VRP at 213. Later he admitted that "perhaps" he had caused marks on N.S.'s neck by holding her. VRP at 227. Nuriyev also had a fresh wound on his hand when he was arrested.

Next, overwhelming evidence proved that Nuriyev caused N.S. substantial bodily harm. The medical professionals' and the neighbors' testimony, which were admitted under separate exceptions to the hearsay rule, provide evidence to support this. Nuriyev does not appeal N.S.'s statements to Koptelev, Babiy, and the medical professionals.

N.S. had bruises all over her body and was bleeding from her left ear. She had ruptured capillaries and linear markings across her throat, scalp trauma, and contusions to her scalp, face, and much of her body. She was concussed, had vertigo, and a strained neck. The bruising and bleeding from her ear proved temporary but was a substantial disfigurement, and any and all of her diagnoses of a strained neck, vertigo, or concussion prove she had temporary but substantial loss or impairment of the function of any bodily part or organ. Likewise, N.S. had a hole in her eardrum consistent with blunt force trauma that caused her hearing loss, pain, and dizziness, which was a substantial loss or impairment of the function of any bodily part.

Turning to strangulation, in addition to Nuriyev's statement that he "got ahold of something" when grabbing N.S., Dr. Collins-Watson testified that N.S.'s throat injuries were consistent with "assault by a manual strangulation." VRP at 152. N.S. also told Babiy that she had urinated herself when Nuriyev strangled her. Dr. Collins-Watson testified that urination is

consistent with strangulation. Thus, there was overwhelming untainted evidence that Nuriyev intentionally assaulted N.S, causing substantial bodily harm or strangulation.

Likewise, there was overwhelming untainted evidence that the bodily harm Nuriyev inflicted on N.S. substantially exceeded the evidence required to show substantial bodily harm. As explained above, when Nuriyev's description of the events of April 7 are combined with Koptelev's and Babiy's testimony, and the medical professionals' testimony on the extent of N.S.'s injuries, there is ample evidence to support a finding of bodily harm exceeding that required to satisfy the elements of assault. Any of N.S.'s injuries alone would have been sufficient to prove substantial bodily harm, but here she sustained multiple substantial injuries in the attack.

Again, Dr. Collins-Watson diagnosed N.S. with ruptured capillaries and linear markings across the throat consistent with "assault by a manual strangulation," scalp trauma, contusions to her scalp, face, elbows, knees, forearms, and chest wall, as well as a strained neck. The jury also saw photographs of N.S.'s injuries. Furthermore, Dr. Wilson diagnosed N.S. with a hole in her eardrum consistent with blunt force trauma, and ongoing hearing loss, pain, and dizziness. Based on this overwhelming untainted evidence, we hold that any reasonable jury would have reached the same result regarding Nuriyev's guilt for second degree assault and the sentencing aggravator that N.S.'s injuries substantially exceeded the level of bodily harm necessary to satisfy that element of the offense.

3. *Felony Harassment – Death Threats*

To convict Nuriyev of felony harassment, including death threats, the State was required to prove that Nuriyev—without lawful authority—knowingly threatened to kill N.S. immediately

or in the future and that he placed her in a reasonable fear that the threat would be carried out.[11] RCW 9A.46.020(2)(b)(ii). Here, there was overwhelming untainted evidence of Nuriyev's threats and evidence of N.S.'s fear.

Although Nuriyev denied threatening N.S., his text messages to her show that he texted her about "beat[ing] . . . heads." VRP at 216-18. The ER staff testified that N.S. told them Nuriyev threatened to kill her if she told anyone he hurt her. VRP at 147-48. N.S. told the staff that Nuriyev was dangerous and would "finish [her] up." VRP at 148, 179. Likewise, when she arrived at her neighbors' house, N.S. asked them to let her in or "he'll kill me." VRP at 57-58. This shows Nuriyev's threats. N.S.'s fear at her neighbors' house, evinced by her collapsing on the floor in tears, stating she was fearful of Nuriyev killing her, as well as her statements to the ER staff, show that she was in fear. This fear was reasonable, especially in light of her injuries. Accordingly, we hold that there was overwhelming untainted evidence for any reasonable jury to convict Nuriyev for felony harassment beyond a reasonable doubt.

4. *Intimidating a Witness*

Turning to the charge of intimidating a witness, the State was required to prove that Nuriyev, by threatening a current or prospective witness, attempted to induce N.S. not to report

---

[11] Jury instruction no. 20 provided:

> To convict the defendant of the crime of harassment, each of the following elements of the crime must be proved beyond a reasonable doubt: (1) That on or about April 7, 2019, the defendant knowingly threatened to kill [N.S.] immediately or in the future; (2) That the words or conduct of the defendant placed [N.S.] in reasonable fear that the threat to kill would be carried out; (3) That the defendant acted without lawful authority; and (4) That the threat was made or received in the State of Washington.

VRP at 281.

information relevant to a criminal investigation or not to give truthful or complete information relevant to a criminal investigation.[12] RCW 9A.72.110(1)(d). Even without Officer Porter's testimony, there was overwhelming untainted evidence in the record to support a finding of guilt beyond a reasonable doubt.

The same facts that support the felony harassment charge discussed above also apply here. Additionally, N.S.'s neighbors and the ER staff all testified that N.S. was scared to call police. Koptelev suggested that N.S. call police but N.S. refused because she was too scared. Koptelev testified that N.S. said she did not want to be the one to file a police report. N.S. told Babiy she was scared Nuriyev would kill her if she called police. This testimony, combined with the statements that Nuriyev threatened N.S. and the evidence of her injuries, is overwhelming. Accordingly, we hold that any reasonable jury would have reached the same result without the tainted evidence.

## II. INTERPRETER AT PRETRIAL HEARING

Nuriyev argues for the first time on appeal that his lack of an interpreter at the October 13 pretrial hearing violated his rights under the confrontation clause. Because Nuriyev did not

---

[12] Jury instruction no. 23 provided:

> To convict the defendant of the crime of intimidating a witness, each of the following elements of the crime must be proved beyond a reasonable doubt: (1) That on or about April 7, 2019, the defendant, by use of a threat against a current or prospective witness, attempted to (a) induce that person not to report the information relevant to a criminal investigation or (b) induce that person not to give truthful or complete information relevant to a criminal investigation; and (2) That this act occurred in the State of Washington.

VRP at 282-83.

object to being without an interpreter below, he has waived this argument and we do not reach it here.

The right of a defendant in a criminal case to a competent interpreter is grounded in the defendant's Sixth Amendment right to confrontation. *State v. Gonzales-Morales*, 138 Wn.2d 374, 379, 979 P.2d 826 (1999); *State v. Aljaffar*, 198 Wn, App. 75, 82-83, 392 P.3d 1070 (2017). A defendant also has a statutory right to a qualified interpreter if he or she needs one. *Aljaffar*, 198 Wn, App. at 82-83; RCW 2.43.030.[13] When the trial court is put on notice that the defendant may not understand English, the court must identify whether an interpreter is needed, and if needed, must appoint one. *State v. Woo Won Choi*, 55 Wn. App. 895, 901, 781 P.2d 505 (1989) *recognized as superseded by statute on other grounds by State v. Anderson*, 72 Wn. App. 453, 458-59, 864 P.2d 1001 (1994); RCW 2.43.030(1)(c).

In *State v. Burns*, our Supreme Court adopted the rule that the right to confrontation may be waived by "'failure to object to the offending evidence.'" 193 Wn.2d 190, 208, 438 P.3d 1183 (2019) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 314 n.3, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009)). Thus, although a manifest constitutional error may be raised for the first time on appeal under RAP 2.5(a)(3), for a confrontation clause challenge, a defendant must raise an objection at trial or waive the right of confrontation. *Burns*, 193 Wn.2d at 210-11.

Nuriyev did not object at trial or at any point during pretrial hearings to the absence of an interpreter, and he therefore waived his right of confrontation on this issue. Although Nuriyev did not object during the hearing, he argues that he "raised the issue at the very next court

---

[13] "Except as otherwise provided in this section, when a non-English-speaking person is involved in a legal proceeding, the appointing authority shall appoint a qualified interpreter." RCW 2.43.030(1)(c).

appearance." Br. of Appellant at 17. That next appearance was the first day of trial. Nuriyev was then provided with an interpreter at trial. Importantly, however, Nuriyev did not object to being without an interpreter at the pretrial hearing. Indeed, he never objected to appearing without an interpreter; instead, he requested a continuance on the first day of trial. The State also noted that Nuriyev appeared at a number of hearings without an interpreter, and Nuriyev has presented no record that he ever objected. Moreover, Nuriyev waived this issue at the pretrial hearing when his counsel stated, "He understands. . . . He understands the other counts." VRP at 21.

Thus, the trial court had no notice and no way of knowing at the pretrial hearing that Nuriyev might require an interpreter. Thus, the trial court was not put on notice that Nuriyev may require an interpreter until the *State* addressed the issue at the end of the pretrial hearing, and the trial court was therefore not required to identify whether Nuriyev needed one. *Woo Won Choi*, 55 Wn. App. at 901. Accordingly, because Nuriyev did not object to being without an interpreter at the pretrial hearing, he waived this right, and we do not reach his argument.

CONCLUSION

We hold that the trial court abused its discretion when it admitted N.S.'s out-of-court statements to Officer Porter. However, we further hold that the erroneously admitted testimony was harmless beyond a reasonable doubt to Nuriyev's conviction for second degree assault, felony harassment, and intimidating a witness because overwhelming untainted evidence supported his conviction. Finally, we do not reach Nuriyev's argument that he was deprived of an interpreter because he did not object below and therefore waived that argument. Accordingly, we affirm.

26

No. 54152-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Lee, C.J.

Glasgow, J.

27