# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59315-7-II |
| Respondent, | |
| v. | |
| NAZIEERE D'MICHAEL THOMAS, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Desiree Carlisle was shot and killed in a motel parking lot by a person in a passing car. Investigation revealed that Nazieere Thomas had recently stolen the car from a tow yard. The police apprehended Thomas after he attempted to elude them in the same car.

After the arrest, the police searched the car and found large amounts of fentanyl and methamphetamine, as well as several articles of clothing and a distinctive backpack. Police interviewed Thomas on the day of his arrest, and he voluntarily answered questions for thirty minutes before invoking his right to remain silent. Police also interviewed Thomas' girlfriend, Alayciana Dollison; and her mother, Vanessa Gamage. All three interviews were videotaped.

Police also found another person's wallet and identification on Thomas when he was booked into jail, which connected Thomas to a reported robbery several weeks before. Location data from Thomas' phone and GPS data from the car placed Thomas at the scene of the motel shooting, and detectives found surveillance footage from surrounding areas that showed Thomas wearing clothing and the distinctive backpack that matched those they had found in the car.

The State charged Thomas with first degree murder, second degree murder, attempting to elude police, second degree unlawful possession of a firearm, second degree burglary, second degree taking a motor vehicle without permission, two counts of unlawful possession of a controlled substance with intent to deliver, two counts of duty in case of damage to an attended vehicle, and first degree robbery. Thomas sought to sever the murder charges from the remaining charges so that they could be tried separately. The trial court severed the first degree robbery charge, which was based on the reported robbery from several weeks before the murder, but declined to sever the rest of the charges.

The State sought to have Gamage testify at Thomas' primary trial that included the murder charge. After she agreed to testify, however, Thomas had a jail phone call with an associate of his where the two discussed the possibility of Gamage testifying. The trial court determined that the call contained a coded exchange in which Thomas offered his friend money and cocaine to prevent Gamage from testifying. Gamage did not appear at trial, and the trial court admitted her recorded police interview and Thomas' jail call into evidence. The trial court also admitted the recording of Thomas' police interview into evidence. Thomas was convicted of all charges at this trial.

In his separate robbery trial, Thomas moved to instruct the jury on third degree theft and second degree robbery, and the trial court declined the motion as to third degree theft. Thomas was convicted of second degree robbery.

Thomas appeals his convictions. He argues there was insufficient evidence to convict him of first degree murder, second degree murder, or unlawful possession of a controlled substance with intent to deliver. He argues that the prosecutor made improper comments about the State's burden of proof in closing argument in his primary trial. He claims that the trial court should not

have admitted the jail phone call and the police interviews of Gamage and himself into evidence nor permitted the jury unlimited review of the latter two recordings during deliberations. He argues that the trial court should have severed his murder charges from all the other charges. He argues cumulative error. And he assigns error to the trial court's failure to offer a third-degree theft instruction in his robbery trial. We disagree and affirm.

FACTS

I. BACKGROUND

A.    Automobile Accident and Theft

On July 12, 2022, Jaden Watts was driving home from work when a black Audi SUV swerved into him. Watts and the other driver pulled into a nearby driveway. The other driver, later identified as Nazieere Thomas, was speaking angrily and "pulling intimidation tactics." 2 Verbatim Rep. of Proc. (VRP) (Dec. 18, 2023) at 162. Thomas asked Watts "to step aside while he checked [Watts'] car." *Id.* Without permission, Thomas took a toolbox from Watts' trunk and Watts' wallet, which contained money and Watts' identification. Thomas got "in [Watts'] face" and said, "I should beat your [a**] right now." *Id.* at 165. Watts called the police when he got home.

B.    Towing and Theft of the Honda Insight

A week later, on July 19, deputies with the Pierce County Sheriff's Department received a report of a suspicious person wearing a ski mask and were dispatched to investigate. When deputies arrived at the location specified by the call, they did not find the suspicious person but did discover an unoccupied, dark gray Honda Insight. The car's engine was running and the door was cracked

3

open. The deputies ran the car's license plate and discovered that it was registered to a company that provides short-term car rentals. The deputies called for a tow.

While the deputies waited for a tow truck to arrive, a man identifying himself as "Keshawn" approached the deputies and told them that the car belonged to his girlfriend. 6 VRP (Oct. 4, 2023) at 656. A deputy gave the man the address of the tow yard where the car was being taken. The man left as the car was being towed away. The interaction was captured by the deputy's body-worn camera. Deputies later identified the man as Thomas. The true renter of the Honda Insight at the time was Vanessa Gamage. Gamage's daughter, Alayciana Dollison, was Thomas' girlfriend.

Later that same day, a man wearing a ski mask arrived at the tow yard without authorization and drove the Honda Insight away. An employee of the tow yard called the police to report the theft.

C.      Shooting of Desiree Carlisle and Investigation

A few days later, on July 23, Desiree Carlisle was sitting in the driver's seat of her car in a motel parking lot on Hosmer Street in Tacoma while several friends stood nearby and tried to help her with car trouble. Carlisle was shot in back of the head and killed as a dark gray sedan with no license plates drove through the parking lot and behind her car. The gunshot left a hole in the left side of the car's rear window.

Police detectives reviewed surveillance footage from the motel and determined that the gray sedan was a 2022 Honda Insight. The footage demonstrated that the Honda arrived at the motel at 8:43 p.m. and the shooting occurred at 8:46 p.m. The detectives searched their database and discovered the report of the tow yard theft of a 2022 Honda Insight from July 19. The detectives then reviewed the body-worn camera footage from the original impoundment of the

4

Honda Insight that was stolen from the tow yard, which captured sheriff's deputies' interactions with Thomas.

The detectives also reached out to the rental company that owned the Honda Insight from the tow yard incident, and the company sent the detectives GPS data associated with that car. The GPS data placed the tow-yard Honda at the location of the shooting when Carlisle was shot. Using the GPS data, the detectives identified several locations where the Honda had been before and after the shooting and pulled surveillance footage from those locations. In some of the footage, the driver of the Honda, who generally resembles Thomas, was visible.

Using the GPS data, the detectives tracked the Honda to Gamage's home. On July 25, police were surveilling Gamage's home when Thomas entered the Honda and began to drive away. Police began pursuing the Honda. Thomas attempted to flee, hitting two other vehicles in the process. Both of the vehicles Thomas hit were occupied at the time. The second collision damaged the Honda and forced it to stop. Police then took Thomas into custody.

When police searched the Honda, they found its license plates, which had been removed and stashed in the trunk. Police also found a black and white sneaker, two white tank tops, and a distinctive backpack with shark's-tooth markings on it. Inside the backpack the police found a bag of pills and a bag of white powder, which a laboratory later tested and identified as fentanyl and methamphetamine, respectively. At no point in the investigation did police find a firearm belonging to Thomas or otherwise connected to the shooting, nor did they identify a motive for Thomas to shoot Carlisle.

D.      Police Interview with Thomas

Detectives Hannah Heilman and Steve Shank took Thomas back to the police station to question him. The questioning was captured on video. They read Thomas his *Miranda*[1] rights. They then asked Thomas if he would voluntarily answer questions.

Thomas initially asserted that he did not mind answering questions because he was innocent but then asked if he would be arrested if he did not comply. He expressed concern that it would look suspicious if he declined to answer questions: "I've never been in this position and this kind of scares me 'cause I . . . don't want to incriminate myself, but I also don't want to go to jail, you know; that makes me look suspicious, not answering or talking to you guys." Ex. 318, at 1 min., 25 sec. to 1 min., 40 sec. (on file with the court). The detectives told Thomas that they just wanted to talk to him to "get everything right." Ex. 318, at 1 min., 40 sec. to 1 min., 42 sec. They asked him to sign a form acknowledging that he understood his *Miranda* rights, which Thomas signed.

The detectives began asking Thomas questions, mostly regarding his activities for the last several days, and for roughly fifteen minutes he answered without complaint. Thomas told the detectives that on July 23, 2022, he was staying at his grandmother's house and that throughout the day he had visited a recording studio in north Tacoma and a friend's apartment in the Hilltop neighborhood. He claimed he had been driving his Audi SUV that day. The detectives then asked Thomas for the passcode to his phone, and Thomas told them he could not give it to them. Later, the detectives asked Thomas what types of social media he used, and he responded that he used

---

[1] *Mirana v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, L. Ed. 2d 694 (1966).

Facebook and Instagram. The detectives asked Thomas for his Facebook profile name and Thomas said he could not tell them.

A few minutes later, the officers told Thomas that they were investigating an incident that had happened on Hosmer Street on July 23 and that they had video of him on Hosmer that day, which contradicted Thomas' account of his whereabouts. Thomas insisted that he had not been on Hosmer that day. At 8:27 p.m., about thirty minutes into the questioning, Thomas stated that he wanted to invoke his right to remain silent. The detectives continued to question him. Thomas repeatedly asserted that he wished to remain silent as the detectives continued asking questions.

Thomas was booked into jail that same day, and he was found in possession of Watts' identification card. A detective contacted Watts and showed him a photo montage of potential perpetrators of the theft of his identification and toolbox. Watts "immediately identified" Thomas from the photo montage. Clerk's Papers (CP) at 162.

E.      Police Interview with Gamage

Police conducted a recorded interview with Gamage on the day Thomas was taken into custody. In her interview, Gamage told police Thomas was driving the Honda Insight on July 19 when it was impounded and that to her knowledge, Thomas was the only person who had driven the Honda since July 12. Gamage also told police that Thomas was out of the house on the day of the murder and did not return until very early the next morning.

Gamage told police that Thomas sometimes wore a black mask that covers most of his face. She also told them that Thomas owned a gun. Finally, Gamage told police that she had cameras set up outside her house. She stated that she had put up the cameras because she did not trust the people Thomas and Dollison were hanging out with and did not know what Thomas "does

7

out there." Ex. 316, at 1 min., 23 sec. to 1 min., 24 sec. Police later pulled footage from Gamage's cameras from the day of the murder, which showed a person with Thomas' build and complexion driving the gray Honda.

## II. PRETRIAL HISTORY

The State charged Thomas with first degree murder with extreme indifference and second degree murder (for killing Carlisle); second degree unlawful possession of a firearm (for possessing the gun used in the shooting); second degree burglary and theft of a motor vehicle (for taking the Honda Insight from the tow yard); second degree taking a motor vehicle without permission (for taking the rented Honda Insight without permission and removing its license plates); attempting to elude a pursuing police vehicle; two counts of duty in case of damage to an attended vehicle (for failing to stop after hitting two cars during his attempted flight from police);[2] and two counts of unlawful possession of a controlled substance with intent to deliver (for possessing fentanyl and methamphetamine). Thomas was also charged with first degree robbery for taking Watts' wallet and toolbox.

As trial approached, the State sought to secure Gamage's participation as a witness. It tried several times to contact her by phone and in summer 2023 made two unsuccessful attempts to serve her with a subpoena. On September 20, 2023, the trial court issued a material witness warrant for Gamage.

---

[2] RCW 46.52.020(1) requires "[a] driver of any vehicle involved in an accident resulting in the injury to or death of any person or involving striking the body of a deceased person [to] immediately stop such vehicle at the scene of such accident" until they have fulfilled certain requirements.

A few days before trial was set to begin, Thomas moved to sever his murder charges from the rest of his charges, seeking separate trials. The trial court severed the first degree robbery charge but none of the other charges. To justify its decision not to sever, the trial court reasoned that the State's evidence was "relatively strong as to all" the counts; that Thomas' defense to each charge was a general denial and thus his defenses would not confuse the jury; that it would instruct the jury to consider each crime separately; and that the *res gestae* of each of the counts was "part and parcel of [the] entire investigation." 1 VRP (Sep. 26, 2023) at 21-22. The trial court also stated that judicial economy concerns favored a single trial for all the non-robbery counts because each "involve[d] many of the same witnesses." *Id.* at 23. Thomas did not renew his severance motion at trial.

On the same day, the trial court held a CrR 3.5 hearing to determine whether and to what extent Thomas' interview with the police on the day of his arrest was admissible. The trial court viewed the video recording of the police interview. Thomas testified at the hearing that he had approximately four shots of tequila before being arrested and interviewed by the police that day. Detective Heilman testified that Thomas did not appear intoxicated to her during the interview and that she did not smell any "odor of intoxicants" on him. *Id.* at 35.

Thomas gave conflicting testimony about whether he understood his rights. He first told the court that he understood his rights at the time, but immediately afterward he said that because of his drinking, he did not read the paper informing him of his rights and did not fully understand them. Thomas argued to the trial court that no portion of the interview should be admissible because his intoxication prevented him from understanding his *Miranda* rights.

The trial court found that Thomas was not significantly impaired during the interview and understood his rights. But it determined that Thomas unequivocally asserted his right to remain silent at 8:27 p.m., and that "[a]t that point, all questioning should have ceased." 1 VRP (Sep. 26, 2023) at 60. It ruled that the portion of the video between when the detectives gave Thomas a *Miranda* warning and when Thomas explicitly asked to remain silent was admissible, and the rest of the video was not. Other than his intoxication argument, which the trial court rejected, Thomas did not raise any further objections to the admission of this portion of the recorded interview.

### III. MURDER TRIAL

Thomas' primary trial, which included the murder charges, began on October 2, 2023, and concluded on October 12.

A.      Thomas' Jail Phone Call and Admissibility of Gamage's Police Interview

Partway through trial, on October 5, a detective successfully contacted Gamage by phone and, "though she appeared scared," Gamage agreed to testify. 8 VRP (Oct. 9, 2023) at 920. That same day, Thomas made a phone call from the Pierce County Jail to a friend, Mustafa Byrd, in which the two discussed Gamage's potential participation at trial. This jail phone call occurred a few hours after Gamage agreed to testify. The call was recorded. Gamage failed to appear at trial on October 9 as planned, and the State could not determine her whereabouts.

The State sought to admit the jail phone call as evidence of consciousness of guilt on Thomas' part. The trial court held a hearing to determine whether the call was admissible. The State played the recorded call for the court and concurrently questioned Detective Heilman, who offered her interpretation of the call.

10

On the call, Byrd told Thomas that Byrd had just been released from jail after an arrest for driving under the influence and blamed Gamage and her sister for calling the police on him. Thomas told Byrd that Thomas' trial was set to resume on Monday. Thomas said that there were only two witnesses "that really matter" and that he thought neither was going to show up, but "these [m*****f****rs] are scared because of these warrants," referring to material witness warrants. Ex. 322, at 9 min., 37 sec. to 9 min., 46 sec. He told Byrd that he was "getting nervous" and that because "these witnesses are showing up" he felt that he should have taken a plea deal that the State had offered him. Ex. 322, at 11 min., 19 sec. to 11 min., 30 sec.

Thomas told Byrd that he had "band" for him. Ex. 322, at 12 min., 29 sec. Heilman testified that "band" meant $1,000. Byrd then told Thomas that as soon as he got off the phone, he was going to "call that . . . [b***h]." Ex. 322, at 12 min., 40 sec. to 12 min., 46 sec. Heilman testified that Byrd was referring to Gamage. Thomas then told Byrd that he had "chicken." Ex. 322, at 12 min., 58 sec. Heilman testified that she believed "chicken" referred to cocaine because she "looked it up in the Urban Dictionary and that was one of the meanings." 8 VRP (Oct. 9, 2023) at 908.

Byrd repeatedly told Thomas that he knew what Thomas wanted him to do and that Byrd was going to do it for him, even though Byrd said he otherwise wanted nothing to do with Gamage. Heilman testified that her "overall interpretation" of the call was that "Byrd was stating that he would contact . . . Gamage and ask her not to come to [c]ourt." *Id.* at 902. Heilman also told the trial court that she did not know why Gamage did not show up to testify and could not say that it was because of the call between Byrd and Thomas.

The State argued that Byrd and Thomas were speaking in code on the call, and that Thomas was offering Byrd something of value—money and cocaine—in exchange for Byrd securing

Gamage's unavailability at trial. The State also moved to allow the recording of Gamage's police interview to be introduced as evidence in spite of her absence on the basis that Thomas had forfeited his right to confront Gamage as a witness by wrongfully procuring her absence from trial.

The trial court ruled that Thomas had "engaged in wrongdoing by persuading Mr. Byrd, as an intermediary, to procure Ms. Gamage's unavailability at trial." CP at 898 (Conclusion of Law (CL) 3). Therefore, Thomas had forfeited his right to confront Gamage as a witness, and her police interview was admissible under ER 404(b) as evidence of consciousness of guilt. The trial court reasoned that Thomas clearly suggested it would benefit his case if Gamage did not appear. As to whether Thomas' wrongdoing actually caused Gamage's unavailability, the trial court stated that was "a harder analysis." 8 VRP (Oct. 9, 2023) at 927. But the trial court reasoned that Gamage told Heilman she would testify before the call between Thomas and Byrd took place, Byrd told Thomas he would call Gamage as soon as they got off the phone, and Gamage ultimately failed to appear. Thus, the court inferred that Byrd spoke to her and stopped her from testifying.[3]

B.      Evidence Relating to Shooting

During the trial, the jury heard testimony consistent with the facts described above regarding the police investigation of the shooting and their identification of Thomas as the shooter. The jury also viewed the recordings of Gamage's police interview and the admissible portion of Thomas' police interview, and they heard the jail phone call between Thomas and Byrd. And they saw the footage of Thomas interacting with police before and during the impoundment of the Honda Insight on July 19, 2022.

---

[3] Further discussion of the trial court's findings in support of its ruling on forfeiture by wrongdoing and ER 404(b) are discussed in more detail in the analysis below.

1.    DeAngelina Alberta's testimony

DeAngelina Alberta, a friend of Carlisle's who was present during the shooting, testified that she saw a gray car drive by and then heard a gunshot or gunshots coming from the car, though she did not see a gun. She told the jury that she "hit the ground" as soon as she heard the shots. 8 VRP (Oct. 9, 2023) at 888. She further testified that the driver of the car was wearing a dark mask that had one hole revealing his eyes and nose. She testified that she regularly saw people in that neighborhood wearing similar masks. She also told the jury that she did not see anyone else in the Honda except the driver.

2.    Evidence about Thomas' clothing

The jury saw and heard a variety of evidence relating to Thomas' clothing and the backpack. Dollison testified that Thomas sometimes wore a ski mask with one hole. She further testified that wearing ski masks is a trend and that a lot of people around her neighborhood wear them. The jury also saw a portion of a police interview with Dollison, in which Dollison similarly said that Thomas sometimes wore a black mask with a single hole for the eyes and that masks like this were a trend.

The State admitted the surveillance footage from Gamage's driveway that shows a person with Thomas' build and complexion getting into the Honda and driving away at around 12:31p.m. on the day of the shooting, shirtless but wearing black and white sneakers. Footage shows the same person returning with the Honda to Gamage's house a little after 2:00 p.m., now wearing a white tank top in addition to the black and white sneakers, and carrying a backpack with shark's-tooth markings. Around 4:00 p.m., footage shown to the jury shows the same person, still wearing the same outfit, getting into the Honda and driving away again. The jury saw footage from later, at

4:42 a.m. the following morning, showing the same person—wearing black and white sneakers, a white tank top, and a black ski mask with one hole, walking a small dog in Gamage's driveway. Another clip of footage from two minutes later shows the same person standing next to Gamage's house; in this clip, the shark's-tooth backpack is visible.

The jury also saw photos taken after Thomas' attempt to elude police in the Honda that showed the inside of the car. These photos showed the shark's-tooth backpack, one black and white sneaker, and two white tank tops.

3.       Location evidence and surveillance footage

The jury viewed evidence and heard testimony explaining location data from Thomas' cell phone from July 23, which was the day of the shooting, to July 25, 2022, as well as GPS records from the rented Honda Insight for those dates. The trial court admitted into evidence a map made by Detective Jeffrey Maahs of the Honda's location based on the GPS coordinates.

The trial court admitted a slideshow made by Federal Bureau of Investigation Agent Eric Perry that showed the location data for Thomas' cell phone overlaid with the GPS coordinates from the rented Honda at corresponding times. The slideshow showed that the locations of Thomas' cell phone and the Honda approximately matched at an area just north of the motel where Carlisle was shot a few minutes after the murder. And it showed that the locations of the phone and the Honda continued to move together afterward.

The jury was also shown time stamped surveillance footage from various locations at or near the motel on the day of the shooting, much of which showed the Honda and a person with Thomas' build and complexion wearing clothing, a ski mask, and a shark's-tooth backpack, which other evidence presented at trial connected to Thomas. For instance, footage from a nearby gas

station and convenience store at around 6:00 p.m. on the day of the shooting showed a gray Honda Insight with no plates pull up to a gas pump. It also showed a man matching Thomas' description and wearing a black ski mask, black and white sneakers, and a shark's-tooth backpack buying something at the convenience store. Detective Heilman testified that the GPS coordinates from the Honda at that time also placed it at that gas station. Additionally, footage from a nearby fast-food drive-through at around 7:50 p.m. that day shows a gray Honda Insight pulling up to the window, driven by a man with Thomas' complexion, wearing a white tank top. Detective Heilman similarly testified that the rented Honda's GPS coordinates matched up with this surveillance footage.

The trial court also admitted into evidence the surveillance footage from the motel at 8:46 p.m. on the day of the shooting. In the footage, two people were standing around Carlisle's car and another was leaning into the car through the open driver's side door. The footage showed the gray Honda driving through the parking lot, slowing down as it passed Carlisle's car from behind, and emitting a gray blur that coincided with the people standing around Carlisle's car ducking for cover. As the Honda drove away, the person who had been leaning into Carlisle's car stood up and appeared to point a gun at the retreating vehicle. Detective Heilman testified that the gray blur visible in the footage was smoke. She further testified that the rented Honda's GPS coordinates placed it at the motel at this time.

4.      Other evidence

The trial court admitted images of the shattered rear window of Carlisle's car after her death, which showed ballistic damage on the driver's side. Other photos of the Honda from after police recovered it showed that its license plates had been removed and stashed in the trunk of the car.

In the police interview with Dollison shown to the jury, Dollison said that Thomas had a black gun and drew a picture of the gun for the police. The trial court admitted the picture of the gun into evidence. Additionally, the jury saw an instant message from Thomas sent at 8:43 p.m. the day of the murder telling someone that he was at "96 hosmer." Ex. 272. The hotel where Carlisle was shot was located on Hosmer Street.

C.      Evidence Relating to Drug Possession Charges

Martin McDermot, a forensic scientist at the Washington State Patrol Crime Laboratory, testified that the pills seized from the Honda contained fentanyl, and that there were approximately 709 pills. He further testified that the powder seized from the Honda contained methamphetamine weighing 20.5 grams.

Tacoma Police Officer Djervatius Dobbins testified that when determining whether a person in possession of drugs is using or dealing, he "look[s] for quantities." 6 VRP (Oct. 4, 2023) at 587. He testified that a "[u]ser amount" of fentanyl is roughly 10 to 20 pills per day, whereas a dealer may be carrying a "couple hundred to a thousand." *Id.* He testified that a methamphetamine user will commonly carry 3-to-5 grams. Dobbins further testified that dealers will typically have "distribution material" such as baggies to store drugs in, as well as vehicles or cell phones not registered in their own name. *Id*. He stated that dealers "will get rental cars because [they] can use them for a couple days and then get rid of them." *Id.* at 588.

D.      Closing Argument

During its closing argument, the State discussed its burden of proof:

The burden of proof here . . . is on the State. And there's Instruction No. 3 that provides a definition. "Reasonable doubt is one for which a reason exists. It may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all the

evidence or lack of evidence." There's also this part. "If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." If you have an abiding [belief] in the truth of the charge, you are then satisfied the State has met its burden. *It's not beyond all reasonable doubt, but it's if you have an abiding belief in the truth of the charge*.

10 VRP (Oct. 11, 2023) at 1243 (emphasis added). The defense objected to the State's comments on the grounds that it mischaracterized the State's burden. The trial court overruled the objection and stated, "Go ahead." *Id.* At the end of its closing argument, the State told the jury that "the State has proven beyond a reasonable doubt that the defendant is guilty" of all counts and asked the jury to return a guilty verdict. *Id.* at 1261.

The State made similar comments during its rebuttal argument:

Again, the State's burden of proof is reasonable doubt. *It's not beyond all reasonable doubt*. It's when you have an abiding truth and belief in the charge, here. The State has met its burden of proof over and over again with regard to all of these counts.

11 VRP (Oct. 12, 2023) at 1280 (emphasis added). Defense counsel did not object to this comment. Shortly afterward, just before the end of its rebuttal, the State said that it had "met its burden of proof. And without a doubt -- or beyond all reasonable doubt, the defendant is guilty." *Id.*

E.      Deliberations and Verdict

After closing arguments, the trial court told the jurors that when they retired to the deliberation room, they would "have access to a program . . . that [would] allow [them] to watch any videos that [they] would like" from the USB drives containing admitted exhibits. *Id.* at 1284. The trial court did not restrict the jury's ability to view video exhibits or require its permission to do so.

The jury found Thomas guilty on all counts in this primary trial, including both first and second degree murder. It found by special verdict that Thomas was armed with a firearm during

the commission of the murder.[4] It also found by special verdict that while Thomas was attempting to elude the police, persons other than Thomas or pursuing law enforcement officers were endangered.

## IV. ROBBERY TRIAL

Thomas' trial for first degree robbery occurred two months later on December 18, 2023. Watts, the person whose wallet and tools were stolen, testified about the events of July 12, 2022, consistently with the facts described above. He also testified that Thomas was holding a gun at the time of the altercation but did not point the gun at him. Thomas testified that after the collision with Watts, he noticed damage to his vehicle. He further testified that he asked Watts if he had been texting and driving or driving drunk. He testified that he told Watts that he had caused "at least $2,000 in damages." 3 VRP (Dec. 19, 2023) at 276.

Thomas claimed that he asked Watts whether he had insurance and an identification, and that Watts handed him his identification but told him he did not have insurance. Thomas testified that Watts wanted to "work [it] out without the police being involved" and offered to pay Thomas. *Id.* Thomas testified that he asked Watts for collateral to ensure he would pay for the damage to the car. He claimed that Watts offered to let Thomas keep his identification and bank card for a few days until he could pay Thomas several hundred dollars. Thomas testified that he never "brandish[ed] a weapon" or threatened Watts. 3 VRP (Dec. 19, 2023) at 277.

After the defense rested, Thomas requested that the jury be instructed on the lesser included offenses of second degree robbery and third degree theft. The State did not object. Thomas argued

---

[4] Thomas' conviction for second degree murder, which was based on the same facts as his conviction for first degree murder, was later vacated because of the prohibition against double jeopardy.

18

that the third degree theft instruction was appropriate because if the jury did not believe Watts' testimony that Thomas used a firearm or threatened Watts, and also did not believe Thomas' testimony that he intended to return Watts' license when Watts repaid him, "that would be a theft without a robbery or force component." *Id.* at 285. When pressed by the trial court, Thomas conceded that there was "no affirmative evidence" supporting a third degree theft charge. *Id.*

The trial court allowed the instruction for second degree robbery but declined to issue the instruction for third degree theft. It concluded that third degree theft was not legally a lesser-included offense to first degree robbery. It further reasoned that because the State's version of events included Thomas threatening Watts with a firearm, and Thomas' version of events was that Watts gave him the wallet voluntarily, there was either a robbery—a taking by threatened use of force—or no crime at all.

The jury found Thomas not guilty of first degree robbery but guilty of the lesser-included offense of second degree robbery.

Thomas appeals his convictions.

ANALYSIS

I. Sufficiency of Evidence

A. Rules and Standards

When assessing whether sufficient evidence supports a conviction, we ask "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019) (internal quotation marks omitted) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion)). "'[A]ll reasonable inferences from

the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.'" *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "'A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn'" from it. *Id.* (quoting *Salinas*, 119 Wn.2d at 201).

"Circumstantial and direct evidence are . . . equally reliable, and credibility determinations are not subject to review." *State v. Zghair*, 4 Wn.3d 610, 620, 567 P.3d 1 (2025). "'[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation.'" *Id.* (alteration in original) (quoting *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013)). Even where "[t]here are hypothetically rational alternative conclusions that the jury could have drawn from the proven facts," the jury is entitled to discard an inference it believes to be "unreasonable under the circumstances." *Id.* at 624.

B.      Evidence that Thomas was the Shooter

Thomas argues that there was insufficient evidence for the jury to conclude he was the shooter because there was only circumstantial evidence and the jury's conclusion was speculative. He reasons that the evidence showed there were times when the Honda was parked but not fully captured by surveillance footage, that another person could have entered the Honda on one of those instances, and that this other hypothetical person could have been the shooter.

Thomas also contends that the State did not put forth enough evidence to show that the gunshot that killed Carlisle came from the Honda. He notes that the State presented "[n]o bullet trajectory or similar evidence." Opening Br. of Appellant at 24. And he argues that "what the [testifying] detective claim[ed] [was] smoke from a gun" coming from the car in the video of the

shooting could have been "cigarette smoke" or "an illusion in the video when it [was] viewed on a slower speed." Opening Br. of Appellant at 25. We disagree.

The State presented significant evidence from which the jury could infer that Thomas was the shooter. Footage from Gamage's driveway showed Thomas getting into the Honda and driving away on the day of the shooting, before it occurred. GPS data connected to the Honda and location data from Thomas' phone matched up and placed Thomas with the Honda at the time of the shooting. Surveillance footage from various locations and times matching the GPS data showed the Honda being driven by a person who shared Thomas' build and complexion, along with specific clothing and accessories (such as a black ski mask, white tank top, black and white sneakers, and the distinctive shark's-tooth backpack); other evidence presented at trial connected Thomas to these items.

Considering all this evidence, it was reasonable for the jury to infer that Thomas was driving the Honda through the parking lot when the shooting occurred. Thomas' suggestion that another person could have entered the Honda sometime during the day and been the true shooter does not persuade us. There is no evidence to suggest that another person ever entered the car. And the jury was entitled to discard that purely speculative possibility in favor of the more obvious and likely conclusion that Thomas, the only person connected to the Honda that day, was the shooter.

The evidence was also sufficient to support an inference that the gunshot that killed Carlisle was fired from inside the Honda Thomas was driving. Alberta testified that the shot came from the passing car. Additionally, the footage of the shooting showed the Honda slowing as it drove past Carlisle's car. The people around Carlisle's car ducked for cover while the Honda was directly behind Carlisle's car. At the same time, a gray blur was visibly emanating from the driver's side

window of the Honda—what Detective Heilman testified was smoke. And photos of Carlisle's car after the shooting showed ballistic damage to the rear window on the driver's side, leading to an obvious inference that the bullet came through the back of the car.

The jury was entitled to infer that the gray blur in the surveillance footage was smoke from a gun rather than cigarette smoke or an illusion. And even if there was no smoke, the rest of the circumstances—the Honda slowing down, people running for cover, the ballistic damage to the back window of Carlisle's car, and the absence of alternative explanations for how Carlisle was shot—were enough to support an inference that the gunshot came from inside the Honda. We hold that there was sufficient evidence for the jury to conclude that Thomas was the shooter.

C.      Evidence of Extreme Indifference

"A person is guilty of murder in the first degree when[,] . . . [u]nder circumstances manifesting an extreme indifference to human life, [they] engage[] in conduct which creates a grave risk of death to any person, and thereby causes the death of a person." RCW 9A.32.030(1)(b).

Thomas claims that even if he was the shooter, there was insufficient evidence at trial to find that he acted with extreme indifference to human life. Extreme indifference requires "an aggravated or extreme form of recklessness" creating "a 'very high degree of risk'" of killing a person. *State v. Dunbar*, 117 Wn.2d 587, 594, 817 P.2d 1360 (1991) (quoting 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 7.4(a) at 200 (1986)). "[T]he state must show that the defendant acted . . . with extreme indifference to human life in 'general[],' as opposed to simply endangering the life of a 'particular' victim or victims." *State v. Pettus*, 89 Wn. App. 688, 694, 951 P.2d 284 (1998) (second alteration in original) (quoting *State v. Berge*, 25 Wn. App.

22

433, 437, 607 P.2d 1247 (1980), *abrogated on other grounds by State v. Gamble*, 154 Wn.2d 457, 114 P.3d 457 (2005)).

In *State v. Pastrana*, the defendant "fired one shot at another car on the freeway, killing one of the three occupants." 94 Wn. App. 463, 467, 972 P.2d 557 (1999), *abrogated on other grounds by Gamble*, 154 Wn.2d. The defendant claimed he had been aiming for the car's tire. *Id.* at 469. The jury convicted the defendant of first degree murder with extreme indifference. *Id.* at 468. This court held that there was sufficient evidence for the conviction because the defendant's actions endangered the lives of all three passengers of the other car as well as his own passenger "and other drivers . . . on the crowded freeway." *Id.* at 473; *c.f. Berge*, 25 Wn. App. at 434, 436 (holding that there was insufficient evidence to convict the defendant of murder with extreme indifference where the defendant shot a victim 30 times in the victim's living room with no one else present).

Thomas argues that a reasonable jury could not have inferred extreme indifference because there was no evidence that he fired more than one shot, that he "fired from a fast-moving vehicle," or that he "wished to harm Carlisle or the other people near her car." Opening Br. of Appellant at 28-29. We disagree with Thomas' conclusion.

The surveillance footage showed that when Thomas fired at Carlisle's car, three people were standing very close by. One was leaning into the car from the open driver's seat door with his head and torso inside the car. At the time she was shot, Carlisle was sitting in the driver's seat of the car. Even if Thomas fired only one shot, he endangered not only Carlisle but also her friends standing nearby. In *Pastrana*, one shot was enough to support a finding of extreme indifference because even if Pastrana was aiming only for the car's tire, it was highly likely that he would hit

one of the car's three passengers instead. Although here, unlike in *Pastrana*, Thomas was driving slowly, his actions still created a very high likelihood that he would kill another person given how close the bystanders were to Carlisle's car—especially the person leaning into the driver's seat area. It is irrelevant that the State did not present evidence that Thomas wished Carlisle or her friends harm. Although evidence of motive can be relevant to proving extreme indifference, *see State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009), "[n]o crime requires the State to prove motive." *Zghair*, 4 Wn.3d at 627. We hold that there was sufficient evidence to convict Thomas of first degree murder by extreme indifference.

D.     Evidence of Intent to Deliver a Controlled Substance

Thomas argues that there was insufficient evidence to convict him of possession of a controlled substance with intent to deliver. He does not dispute that he possessed drugs. But he claims that the State's only evidence that he intended to deliver them was their large quantity, which is not enough to support an inference of intent to deliver. Because the State had additional evidence of Thomas' intent, we disagree.

RCW 69.50.401(1) makes it "unlawful for any person to . . . possess [a controlled substance] with intent to . . . deliver." "'Mere possession of a controlled substance, including quantities greater than needed for personal use, is not sufficient to support an inference of intent to deliver.'" *State v. Sprague*, 16 Wn. App. 2d 213, 233, 480 P.3d 471 (2021) (quoting *State v. O'Connor*, 155 Wn. App. 282, 290, 229 P.3d 880 (2010)). There must be some additional factor that suggests intent. *Id.* at 234. Nevertheless, the jury is entitled to consider quantity as one factor supporting that inference. *See State v. Hoover*, 36 Wn. App. 2d 68, 77, 581 P.3d 665 (2025). "Examples of additional factors that have been held sufficient to support an inference of intent to

deliver include large amounts of cash, scales, cell phones, address lists, and the like, which have been acknowledged as delivery paraphernalia" *State v. Slighte*, 157 Wn. App. 618, 627 n.13, 238 P.3d 83 (2010).

The amount of fentanyl and methamphetamine found in Thomas' backpack—709 pills and 20.5 grams, respectively—is much higher than the amount Dobbins testified was typical for people who are possessing drugs for personal use. While Thomas is correct that the high quantity alone cannot be dispositive, he is incorrect that quantity was the only evidence of intent to deliver that the state presented to the jury. Dobbins testified that dealers often drive rental cars or cars not registered in their own names to avoid detection. The State presented evidence that the vehicle Thomas was driving was a rental car. Further, the car was rented not in Thomas' name but in Gamage's. And the license plates had been removed, which a jury could infer was done to make the car more difficult to trace. A reasonable jury could infer, based on the high quantity of drugs in Thomas' backpack *and* the fact that Thomas was driving a rental car that was registered in another person's name and had its plates removed, that Thomas intended to deliver the drugs. We hold that sufficient evidence supported Thomas' convictions for possession of a controlled substance with intent to deliver.

## II. PROSECUTORIAL MISCONDUCT

Thomas claims that the State improperly mischaracterized its burden of proof when it twice told the jury that it did not need to prove the charges against Thomas "'beyond all reasonable doubt.'" Opening Br. of Appellant at 35 (quoting record). "[T]o prevail on a claim of prosecutorial misconduct, a defendant is required to show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." *In re Pers.*

*Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). The State concedes that the prosecutor stated the burden of proof inaccurately but argues that the mischaracterization did not prejudice Thomas.

A.      Propriety of Comments Relating to Reasonable Doubt Standard

"[I]t is an unassailable principle that the burden is on the State to prove every element and that the defendant is entitled to the benefit of *any* reasonable doubt." *State v. Warren*, 165 Wn.2d 17, 26-27, 195 P.3d 940 (2008) (emphasis added). "It is error for the State to suggest otherwise." *Id.* at 27. Because the prosecutor is "a quasi-judicial officer" whom the jury understands to be "an officer of the State," it is "particularly grievous" for them to "mislead the jury regarding the bedrock principle of the presumption of innocence" embedded in the reasonable doubt standard. *Id.* We agree with the parties that it was improper for the State to tell the jury that its burden of proof is "not beyond all reasonable doubt." 10 VRP (Oct. 11, 2023) at 1243.

B.      Prejudice

The State contends that despite the prosecutor's misstatement of the burden, the evidence against Thomas was strong and thus Thomas fails to establish prejudice. We agree.

If the defendant failed to object below, the improper comments must be "'so flagrant and ill intentioned that [they] evince[] an enduring and resulting prejudice' [that] is incurable by a jury instruction." *State v. Johnson*, 158 Wn. App. 677, 685, 243 P.3d 936 (2010) (internal quotation marks omitted) (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)). But here, the State concedes that Thomas objected. Thus, to establish prejudice, Thomas must show that considering the evidence as a whole, there was "a substantial likelihood" that the misconduct "affect[ed] the jury's verdict." *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

A number of cases help clarify when comments in closing argument that improperly shift or minimize the State's burden are substantially likely to affect a case's outcome. For example, in *Warren*, the prosecutor argued that the beyond a reasonable doubt standard did not mean the jury needed to give the defendant the benefit of the doubt. 165 Wn.2d at 27. The defendant objected to each of the State's improper comments. *Id.* The trial court held that the comments were not prejudicial only because the trial judge "interrupted the prosecutor's argument to give a correct and thorough curative instruction." *Id.* at 28.

In *State v. Anderson*, the prosecutor improperly compared application of the beyond a reasonable doubt standard to ordinary decision-making, among other things. 153 Wn. App. 417, 431, 220 P.3d 1273 (2009). The defendant objected to some improper comments and failed to object to others. *Id.* at 429. As to the comments the defendant objected to, this court held that "in the context of jury instructions that clearly lay out the jury's actual duties and of thorough discussion of the evidence by both counsel during argument," there was not "a substantial likelihood" that the improper comments affected the verdict. *Id.* As to the comments the defendant failed to object to, this court pointed out in dicta that even if the defendant had objected, it would not have found prejudice because "the untainted evidence against Anderson was overwhelming" and the jury had found "the State's witnesses . . . more credible than Anderson." *Id.* at 432 n.8.

In *Emery*, the Washington Supreme Court held that similar improper comments were not incurably flagrant and ill intentioned because they "could have been cured by a proper instruction." 174 Wn.2d at 764. But it noted that the defendant would not have prevailed even under the substantial likelihood standard because despite the improper comments the State "repeatedly stated that the State bears the burden of proof"; the jury instructions properly stated the definition of

reasonable doubt; and "the State's case was very strong, probably overwhelming," with minimal conflicting evidence. *Id.* at 764 n.14.

In sum, whether comments that improperly minimize the State's burden are prejudicial is a case-by-case question. It is relevant whether and to what extent the judge corrected the prosecutor's misstatements and gave the jury correct instruction. In some cases, ordinary jury instructions may not be enough and a more thorough correction may be necessary. *See Warren*, 165 Wn.2d at 28. But the strength of the evidence is an important consideration—improper comments are more likely to affect the outcome of a case with conflicting evidence on both sides than a case where the State's evidence significantly outweighs the defense's. *See Emery*, 174 Wn.2d at 764 n.14.

We acknowledge that the trial court in this case did not explicitly correct the prosecutor's improper misstatement of the State's burden like the trial court in *Warren* did. When Thomas objected to the State's first improper comment, the trial court overruled the objection and told the State to "[g]o ahead." 10 VRP (Oct. 11, 2023) at 1243. The jury received standard instructions that "[t]he State . . . has the burden of proving each element of each crime beyond a reasonable doubt" and that the jury "must disregard any remark, statement, or argument that is not supported by the evidence or the law in [the court's] instructions." CP at 477, 480. But that is not necessarily sufficient to negate the prejudicial effect of comments that undermine "the presumption of innocence due a defendant, the 'bedrock upon which [our] criminal justice system stands.'" *Johnson*, 158 Wn. App. at 685-86 (alteration in original) (quoting *State v. Bennett*, 161 Wn.2d 303, 315, 165 P.3d 1241 (2007)). This is especially true where the judge overruled the objection, suggesting to the jury that the improper statement of the burden was correct. *See State v. Allen*,

182 Wn.2d 364, 378, 341 P.3d 268 (2015) (when a trial court overrules the defense's timely objection to the State's mischaracterization of a legal standard, it can "potentially lead[] the jury to believe that the . . . [mischaracterization] was a proper interpretation of law").

However, like in *Emery* and *Anderson*, here, there was overwhelming evidence against Thomas and comparatively little evidence in his favor at trial. This is not a case where the jury was closely weighing the credibility of competing narratives. As discussed above, GPS data, surveillance footage from multiple locations, and Thomas' own text placed Thomas at the time and place of the murder and showed he was the driver of the Honda. There was no evidence to support any theory other than Thomas being the shooter in Carlisle's murder.

As to Thomas' drug possession with intent to deliver convictions, the State presented evidence that there was fentanyl and methamphetamine in Thomas' backpack; that the amounts of each were significantly higher than what a drug user who was not distributing would carry; that Thomas was transporting the drugs in a car rented in another person's name; and that Thomas had removed the license plates to the car, making it more difficult to trace. There was no evidence to suggest any other reason for Thomas to be carrying such large amounts of fentanyl and methamphetamine.[5]

In light of the lack of conflicting evidence in this case, we hold that the State's comments, while improper, were not prejudicial and do not warrant reversal.

---

[5] Similar reasoning supports upholding Thomas' convictions on the other counts for which he was convicted in this trial. Thomas concedes that the State's evidence for his remaining charges was "notably stronger" than the evidence for murder, possession of a firearm, and possession of controlled substances with intent to deliver. Opening Br. of Appellant at 75. And Thomas did not present any counter evidence related to those charges either.

III. Right to Confrontation and Admission of Gamage's Interview

Thomas next argues that the trial court violated his constitutional right to confront witnesses against him when it admitted Gamage's recorded police interview into evidence even though Gamage did not testify at trial. Thomas contends that it was improper for the trial court to rely on the theory that he forfeited his confrontation rights because the jail phone call did not show that "Thomas engaged in wrongdoing," and there was no evidence that "Byrd influenced Gamage" after the call to procure her absence. Opening Br. of Appellant at 49-50. Thomas also challenges a number of the trial court's findings of fact and conclusions of law related to its determination that he forfeited his confrontation rights.

However, Thomas leaves several consequential findings of fact by the trial court unchallenged:

> On October 5, 2023 at approximately 1:47pm, Detective Heilman was able to speak with Ms. Gamage, and Ms. Gamage agreed to come into court and testify voluntarily on October 9, 2023 at 11:00am.

CP at 895 (unchallenged Finding of Fact (FF) 11).

> On October 5, 2023, at approximately 3:47pm, Mr. Thomas called Mustafa Byrd, a friend of his who lived at the house with him and Ms. Gamage prior to the incident.

CP at 895 (unchallenged FF 12).

> The defendant states "it's a sticky situation for both of us . . . these witnesses are showing up . . . I probably should have taken that ten," referring to guilty plea bargain. Mr. Thomas continued, stating "I didn't think they would show up so they're not going to have no case."

CP at 897 (unchallenged FF 23).

> During the call, Mr. Thomas stated "I gotta band [referring to $1,000 cash] for you, gotta figure something out." Mr. Byrd responded "Bro, as soon as I get off the

30

phone, I'm gonna call that little [b***h] [referring to Gamage] and I already know what to do and say, you hear me? . . . I'm gonna do that shit for you."

CP at 897 (unchallenged FF 24) (first and third alterations in original).

Mr. Thomas replied "let it be known that I have chicken [referring to cocaine]." Mr. Byrd responded, . . . "I'm gonna do it just for you."

CP at 897 (unchallenged FF 25) (alteration in original).

During the phone conversation, Mr. Thomas is very concerned with the possibility of Vanessa Gamage coming in to testify, and suggesting it would benefit his case if the witnesses did not appear.

CP at 897 (unchallenged FF 26).

On October 9, 2023, Vanessa Gamage failed to appear at trial to testify. Ms. Gamage was unavailable for trial. Her whereabouts were unknown.

CP at 898 (unchallenged FF 30).

We treat these unchallenged findings of fact as verities. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002). Because these unchallenged findings provide sufficiently clear and convincing evidence that Thomas engaged in wrongdoing that rendered Gamage unavailable for trial, we hold that the trial court did not err in admitting Gamage's recorded interview.

The federal and state constitutions both guarantee "[t]he right to confront and cross-examine adverse witnesses." *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Under the forfeiture by wrongdoing doctrine, "a criminal defendant forfeits [the] right [to confrontation] when [they] cause[] the witness to be unavailable." *State v. Dobbs*, 180 Wn.2d 1, 10-11, 320 P.3d 705 (2014). The court can admit into evidence "'statements of [the] witness who was . . . kept away by" the defendant's wrongful actions. *Id.* at 11 (internal quotation marks omitted) (quoting *Giles v. California*, 554 U.S. 353, 359, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008)).

31

The forfeiture by wrongdoing doctrine applies "when clear, cogent, and convincing evidence shows that the witness has been made unavailable by the wrongdoing of the defendant and that the defendant engaged in the wrongful conduct with the intention to prevent the witness from testifying." *Id.* The doctrine applies both when the defendant directly procures the witness's absence and when the defendant uses an intermediary to do so. *State v. Hernandez*, 192 Wn. App. 673, 682, 368 P.3d 500 (2016). "In addition, it is not limited to acts of wrongdoing . . . by means of violence." *Id.* Under the clear, cogent, and convincing evidence standard, "[a] court does not need to rule out all possibilities for a witness's absence; it needs to find only that it is highly probable that the defendant intentionally caused it." *Dobbs*, 180 Wn.2d at 16.

In *Hernandez*, the defendant made several jail phone calls to his wife in which he used coded language to ask her to take her brother and daughter, both of whom were intended witnesses, out of the country. 192 Wn. App. at 682-685. He told his wife that "'the flock has to leave . . . because if the flock stays out of the pen, I don't know what will happen.'" *Id.* at 683 (quoting record). His wife asked, "'All the way to where we talked about?'" and the defendant responded, "'Yeah, love. And I'll give you ten chocolates so you can take the flock with you.'" *Id.* at 683-64 (quoting record). The trial court determined that the defendant was providing his wife with money to take the family to Mexico. *Id.* at 684, 686. The appellate court upheld the trial court's finding of forfeiture by wrongdoing, reasoning that "[t]he coded language, when coupled with Hernandez's . . . research about the law regarding his probability of success if a victim was not present to testify at trial, evidenced intentional acts . . . designed to procure the unavailability of a key witness." *Id.* at 686.

32

In *State v. Brownlee*, the defendant accidentally sent a police officer a text message intended for his former partner asking her to recant accusations against him. 18 Wn. App. 2d 1, 7, 492 P.3d 866 (2021). He also made several jail phone calls to his mother and a friend in which "he used thinly veiled language asking [them] to 'fix' his situation." *Id.* at 6, 13 (quoting record). In these calls, the defendant instructed his mother to look for letters he intended to send her and to "be his eyes and ears and to forward his comments 'down the pipeline.'" *Id.* at 6 (quoting record). He told his mother that the witness would "not appear at trial" and would "not be found." *Id.* Although the witness had "made a sworn statement showing a prior willingness to cooperate," she later "stopped responding to the State's attempts to reach her." *Id.* at 13. This court upheld the trial court's finding that Brownlee had improperly procured the witness's absence and therefore forfeited his confrontation rights. *Id.*

Like in *Brownlee* and *Hernandez*, Thomas used coded language to encourage an intermediary to make Gamage unavailable to testify. At the very least, he offered Byrd things of value to "'figure something out,'" and Byrd agreed to call Gamage on Thomas' behalf. CP at 897 (unchallenged FF 24). Thomas argues that the detective's interpretation of the phone call was not sufficient evidence to support that reading of the call. But as discussed above, Thomas left many of the trial court's relevant findings unchallenged.

Significantly, it is possible to parse Thomas' actions and intentions on the call even without Heilman's interpretation. Regardless of what "band" and "chicken" meant, it is clear that Thomas was concerned about Gamage's testimony and was offering Byrd something of value to talk to her for him. We conclude that there was clear and convincing evidence that Thomas acted wrongfully with the intent to have Byrd, as an intermediary, prevent Gamage from testifying.

33

Thomas' argument that the trial court lacked evidence to find that Byrd actually acted to prevent Gamage from testifying is equally unavailing. The trial court was not required to "rule out all possibilities" for Gamage's absence. *Dobbs*, 180 Wn.2d at 16. Mere hours before the phone call, Gamage told the police that she would comply with the warrant and testify at trial, even though she was afraid to do so. Then, Thomas and Byrd spoke, and Byrd promised to talk to Gamage as soon as their phone call was done. Gamage did not show up to testify. That is sufficient circumstantial evidence for the trial court to find that it was highly probable that Byrd actually rendered Gamage unavailable for Thomas. *See id.* at 14 (The unavailable witness directly denied "that his refusal to testify was caused by" the defendant, but the trial court appropriately "saw through the charade" and found that the defendant had caused the witness's absence.) (citing *State v. Fallentine*, 149 Wn. App. 614, 616, 623, 215 P.3d 945 (2009)).

Because we rely on unchallenged findings of fact to reach our conclusions, we need not address Thomas' challenged findings. We hold that the trial court correctly found that Thomas forfeited his right to confront Gamage by securing her absence from trial, and that the admission of her out-of-court interview was therefore proper.[6]

IV. ADMISSION OF JAIL PHONE CALL

Thomas argues that the trial court abused its discretion when it admitted the jail phone call between Thomas and Byrd under ER 404(b) as evidence of Thomas' consciousness of guilt.[7] He

---

[6] The conclusions of law that Thomas challenges reflect the legal standard for forfeiture: that Thomas engaged in wrongdoing, that he intended to render Gamage unavailable, and that his wrongdoing actually rendered Gamage unavailable. As we have explained above, clear and convincing evidence supports these conclusions.

[7] Thomas also challenges two of the trial court's conclusions of law to this effect. *See* CP at 898 (Conclusions of Law (CL) 7, 8).

contends that "[t]he court's reasoning that Thomas was acting out of a guilty conscience rather than innocent self-preservation was merely speculation" because any testimony from the State's witnesses was "unlikely to benefit him" even if he was innocent. Opening Br. of Appellant at 55. He also complains that the recording "provided the jury with additional irrelevant and prejudicial information," including that "Thomas was incarcerated" and that "Thomas was close with Byrd, who . . . describes having recently been released from jail . . . himself and who refers to women in a derogatory way throughout the call." Opening Br. of Appellant at 57-58.

"We review trial court decisions on the admissibility of evidence for abuse of discretion." *Dobbs*, 180 Wn.2d at 10. "A trial court abuses its discretion when its decision 'is manifestly unreasonable or based upon untenable grounds.'" *Id.* (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). ER 404(b) permits the trial court to admit evidence of a person's past wrongs or acts only if they are not offered to prove a person's character or to show that they were acting "in conformity" with that character.

"[E]vidence that the defendant, or a person acting on behalf of the defendant, tried to prevent a witness from appearing and testifying at trial is relevant because it is evidence of the defendant's guilt." *State v. Moran*, 119 Wn. App. 197, 218-19, 81 P.3d 122 (2003); *see also State v. Bourgeois*, 133 Wn.2d 389, 400, 945 P.2d 1120 (1997) ("[E]vidence that a defendant threatened a witness is . . . admissible to imply guilt" so long as a "connection [is] established between" the defendant's action and the witness's reluctance to testify).

In *Moran*, the trial court admitted into evidence a letter the defendant had sent to a friend asking him to talk to a witness the defendant feared might testify against him. 119 Wn. App. at 217-18. In the letter, the defendant used misogynistic slurs to describe the witness and signed off

as "Your homie." *Id.* at 218. The defendant argued that the letter's probative value was outweighed by the danger of unfair prejudice because he used "offensive language" and because the trial court believed "the reference to 'homie' . . . raise[d,]" at that time, "the image of gang violence." *Id.* The court ruled that although that language may have had some prejudicial effect, the trial court did not abuse its discretion when it admitted the letter. *Id.* at 219.

As already discussed above, the trial court appropriately determined that the jail phone call in this case demonstrated that Thomas attempted to have an intermediary, Byrd, prevent Gamage from testifying. Because the call revealed that Thomas acted to repress a witness, it is relevant as evidence that he was conscious of his guilt.

The possible prejudicial effect of the recording is not so strong that it was unreasonable for the trial court to admit it. In *Moran*, the defendant's own use of misogynistic slurs was insufficient to render his letter unacceptably prejudicial. Here, it was not even Thomas himself who used offensive language. The evidence that Thomas was in jail at the time of the call is also not unduly prejudicial. As the State points out, it "could hardly have been a surprise to the jury" that Thomas was in jail prior to trial since he had been arrested for murder. Am. Br. of Resp't at 64. And the evidence that Thomas was associating with a person who had just gotten out of jail was not unreasonably prejudicial. We hold that the trial court did not err when it admitted the jail phone call as evidence of guilt under ER 404(b).

## V. RIGHT TO SILENCE AND ADMISSION OF THOMAS' POLICE INTERVIEW

Thomas argues that the trial court violated his right to silence under the federal and state constitutions when it admitted his recorded interview with the police without redacting three moments: when Thomas "(1) express[ed] concern that he did not want to incriminate himself and

that he feared it looked suspicious if he refused to answer questions; (2) refuse[d] to provide . . . his phone passcode and Facebook username; and (3) refuse[d] to explain to the police where he was on the night of the murder or provide his 'side of the story.'" Opening Br. of Appellant at 60 (quoting record).[8]

Thomas did not argue below that these statements should be redacted or otherwise excluded from the video played for the jury. The State points out, and Thomas does not dispute, that the jury heard these statements only once as the video of Thomas' interview was played. The statements "were not mentioned by any witness during testimony, and the State did not reference them during opening or closing argument." Am. Br. of Resp't at 39.

"The appellate court may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). However, if the claimed error is "manifest error affecting a constitutional right," a party may raise it for the first time on appeal. RAP 2.5(a)(3). "RAP 2.5(a)(3) does not permit *all* asserted constitutional claims to be raised for the first time on appeal, but only certain questions of 'manifest' constitutional magnitude." *State v. Kirkman*, 159 Wn.2d 918, 934, 155 P.3d 125 (2007) (quoting *State v. Scott*, 110 Wn.2d 682, 687-88, 757 P.2d 492 (1988)). An error is "manifest" only if the defendant can show "actual prejudice." *Id.* at 935. "'Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial.'" *Id.* (internal quotation marks omitted) (quoting *State v.*

---

[8] Relatedly, Thomas challenges the trial court's finding of fact that "[a]t no point during Mr. Thomas'[] contact with the detectives[] did the defendant invoke his right to remain silent until approximately 8:27pm." CP at 891 (FF 16); Opening Br. of Appellant at 4. He also challenges the trial court's conclusion of law that "[t]he defendant's interview with law enforcement on July 25, 2022, is admissible pursuant to CrR 3.5 from approximately 7:58pm thr[ough] 8:27pm in the video interview." CP at 891 (CL 3); Opening Br. of Appellant at 5.

*WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)). "[T]he focus of the actual prejudice [determination] must be on whether the error is so obvious on the record that the error warrants appellate review." *State v. O'Hara*, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution protect a person's right to remain silent and prevent the State from using a person's silence "'as substantive evidence of guilt.'" *State v. Fuller*, 169 Wn. App. 797, 814, 282 P.3d 126 (2012) (quoting *State v. Slone*, 133 Wn. App. 120, 126-27, 134 P.3d 1217 (2006)). "[A]fter a person receives *Miranda* warnings, even if [they] elect[] to speak with law enforcement, [they] may invoke the right to silence in response to *any* question posed by law enforcement." *Id.* Accordingly, "'[a] suspect may remain selectively silent by answering some questions and then refusing to answer others without taking the risk that [their] silence may be used against [them] at trial.'" *Id.* at 814-15 (quoting *Hurd v. Terhune*, 619 F.3d 1080, 1087 (9th Cir. 2010)). "A defendant may invoke [their] right to silence after questioning begins, but the invocation must be clear and unequivocal." *State v. Embry*, 171 Wn. App. 714, 750, 287 P.3d 648 (2012).

"To determine whether the State [impermissibly] commented on a defendant's silence, we must first decide whether the State manifestly intended the remarks to be a comment on that right." *Id.* at 749. "[T]he State improperly comments on a defendant's silence when it uses the defendant's silence to its own advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." *Id.*

Because Thomas objects to the inclusion of these statements for the first time on appeal, we will not review them absent manifest constitutional error. Here, it is not obvious from the record that the inclusion of these portions of Thomas' police interview were manifest constitutional error.

To start, Thomas' statement that he worried about incriminating himself but feared refusing to answer questions would look suspicious and his statement that he had no "side of the story" do not appear to be clear and unequivocal invocations of the right to remain silent. Ex. 318, at 29 min., 39 sec. to 29 min., 41 sec.

And it is not obvious that any of the comments Thomas complains about were used by the State as substantive evidence of Thomas' guilt. The brief comments were shown to the jury in the context of a thirty-minute-long video in which Thomas was mostly responsive to the State's questioning. The State did not question any witnesses about these particular comments, nor did it discuss them in closing argument. To the extent that these comments were partial invocations of the right to remain silent, we have found no case law suggesting that merely allowing such comments to be played for the jury without any commentary suggesting that they evince guilt is constitutional error. Because Thomas did not object below, we need not clarify that point here. We hold that Thomas has failed to show manifest constitutional error and decline review of this question.

## VI. JURY'S REVIEW OF EXHIBITS DURING DELIBERATION

Thomas argues that it was error for the trial court to allow the jury unfettered access to the video-recorded police interviews of Gamage and Thomas, which Thomas characterizes as "testimonial evidence." Opening Br. of Appellant at 64. He reasons that this decision violated his right to a fair and impartial jury under the federal and state constitutions because it risked overemphasizing that evidence compared to trial testimony that the jury could not revisit. Thomas concedes that he did not object below to the trial court's decision to allow the jury to review the

39

recorded police interviews during deliberations. Because Thomas did not object, we will not address this question absent a showing of manifest constitutional error.

Thomas argues that the "error is manifest . . . because the error was the court's failure . . . to appreciate the risk of undue emphasis on this testimonial evidence." Appellant's Reply Br. at 38. But Thomas cannot demonstrate any "'practical and identifiable consequences'" of the trial court's decision because he presents no evidence that the jury actually reviewed either interview during its deliberations. *Kirkman*, 159 Wn.2d at 935 (internal quotation marks omitted) (quoting *WWJ Corp.*, 138 Wn.2d at 603). And even if the jury did review them, it is not obvious whether this was constitutional error. Washington courts have permitted juries to review recorded police interviews during deliberations in some cases, especially where, as here, the recordings are unlikely "to stimulate an emotional response rather than a rational decision." *State v. Elmore*, 139 Wn.2d 250, 295, 985 P.2d 289 (1999); *see also State v. Frazier*, 99 Wn.2d 180, 188, 661 P.2d 126 (1983).

Thus, even if permitting the jury unfettered access to these recordings was constitutional error, the error was not manifest. We therefore decline to review this assignment of error.

## VII. SEVERANCE OF CHARGES

Thomas next argues that the trial court erred when it declined to sever the murder charges from all other charges. The State responds that Thomas waived his severance claim when he failed to renew it at trial.

The trial court must order severance upon a party's motion when it "determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). A trial court's decision on whether to sever charges is reviewed for abuse of discretion.

40

*State v. Bythrow*, 114 Wn.2d 713, 717, 790 P.2d 154 (1990). "A party must generally move for severance pretrial and renew a denied pretrial motion for severance 'before or at the close of all evidence.'" *State v. Bluford*, 188 Wn.2d 298, 306, 393 P.3d 1219 (2017) (quoting CrR 4.4(a)(2)). "If the party does not timely make or renew a severance motion, '[s]everance is waived.'" *Id.* (alteration in original) (quoting CrR 4.4(a)(1)).

Thomas does not dispute that he failed to renew his severance motion at trial. Instead, he argues that the Ninth Circuit took "a different approach" to the severance waiver issue in *United States v. Sullivan*, 522 F.3d 967 (9th Cir. 2008), and urges us to follow that approach. Appellant's Reply Br. at 41. The *Sullivan* court noted that it has "identified exceptions to the renewal requirement where the defendant 'can show either that [they] diligently pursued severance or that renewing the motion would have been an unnecessary formality.'" 522 F.3d at 981 (quoting *United States v. Decoud,* 456 F.3d 996, 1008 (9th Cir. 2006)).

Thomas' argument does not persuade us. *Sullivan* involved a severance motion in a federal criminal case; thus, the federal rules of criminal procedure applied. *See id.* In this case, the Washington State criminal rules apply, and Thomas has not established that Washington courts have adopted the Ninth Circuit's approach. The exception outlined in *Sullivan* is therefore not controlling. Additionally, Thomas does not develop his argument for why this court should adopt the reasoning in *Sullivan*. And he gives little explanation for how he "diligently pursued severance" or why "renewing the motion would have been an unnecessary formality." *See id.* We therefore decline Thomas' invitation to rule on whether the *Sullivan* exception applies to CrR 4.4 and hold that his severance claim is waived.

VIII. CUMULATIVE ERROR

Thomas argues that the cumulative effect of the errors he alleges prejudiced him. The cumulative error doctrine is applied in "instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial." *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because we have identified only one error—the prosecutor's statements in closing argument regarding the State's burden of proof—we hold that the cumulative error doctrine does not apply.

IX. LESSER-INCLUDED OFFENSE INSTRUCTION

Finally, Thomas argues that the trial court erred when it refused to instruct the jury on third degree theft as a lesser included offense of first degree robbery at Thomas' second trial.

RCW 9A.56.190 states:

> A person commits robbery when [they] unlawfully take[] personal property from the person of another or in [their] presence against [their] will by the use or threatened use of immediate force, violence, or fear of injury to that person or [their] property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial.

"A person is guilty of robbery in the first degree if . . . [i]n the commission of a robbery or of immediate flight therefrom, [they] . . . [are] armed with a deadly weapon; or . . . [d]isplay[] what appears to be a firearm or other deadly weapon." RCW 9A.56.200(1)(a)(i), (ii). "A person is guilty of robbery in the second degree if [they] commit[] robbery." RCW 9A.56.210(1). Although Thomas was ultimately convicted of second degree robbery, the question before us is whether a third degree theft instruction was appropriate as a lesser-included offense to the charged crime of first degree robbery.

A person commits theft when they "wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive [them] of such property or services." RCW 9A.56.020(1)(a). "A person is guilty of theft in the third degree if [they] commit[] theft of property or services which . . . does not exceed seven hundred fifty dollars in value." RCW 9A.56.050(1)(a).

Under the test first articulated in *State v. Workman*, 90 Wn.2d 443, 584 P.2d 382 (1978), "a defendant is entitled to a lesser included offense instruction if (1) each of the elements of the lesser offense is a necessary element of the offense charged (legal prong) and (2) evidence in the case supports an inference that the lesser crime was committed (factual prong)." *State v. Coryell*, 197 Wn.2d 397, 400, 483 P.3d 98 (2021). We review a trial court's determination on whether the legal prong of *Workman* was met de novo and its determination of whether the factual prong was met for abuse of discretion. *Id.* at 405.

"The factual prong of *Workman* is satisfied only if based on some evidence admitted, the jury could reject the greater charge and return a guilty verdict on the lesser." *Id.* at 407. "'It is not enough that the jury might simply disbelieve the State's evidence.'" *Coryell*, 197 Wn.2d at 407 (quoting *State v. Fowler*, 114 Wn.2d 59, 67, 785 P.2d 808 (1990), *overruled on other grounds by State v. Blair*, 117 Wn.2d 479, 816 P.2d 718 (1991)). "'Instead, some evidence must be presented [that] affirmatively establishes the defendant's theory on the lesser included offense.'" *Id.* (quoting *Fowler*, 114 Wn.2d at 67).

"When the appellate court determines if the evidence at trial is sufficient to support an instruction, it views the 'supporting evidence in the light most favorable to the party that requested the instruction.'" *Id.* at 415 (quoting *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d

1150 (2000)). "Defendants are entitled to the benefit of all the evidence presented at trial, regardless of whether they were the introducing party." *Id.* "The court typically 'err[s] on the side of instructing juries on lesser included offenses.'" *Id.* (alteration in original) (quoting *State v. Henderson*, 182 Wn.2d 734, 736, 344 P.3d 1207 (2015))

The State concedes that the legal prong of the *Workman* test was met here but argues that the factual prong was not. Under the factual prong, the relevant question is whether the trial court abused its discretion when it determined that the jury could not conclude, based on evidence affirmatively presented, that Thomas wrongfully took Watts' property without threatening any force.

Thomas testified that Watts gave Thomas his wallet as collateral. Thus, Thomas asserted he did not commit *any* improper taking, with or without force or fear. In contrast, Watts testified that Thomas took his wallet and toolbox without permission and that Thomas was carrying a gun when he did so.

Viewing Thomas' testimony in the light most favorable to him, his version of the facts supports a conclusion that no improper taking occurred at all, but not a conclusion that he committed third degree theft instead by tricking Watts into giving him his wallet. Thus, Thomas' testimony does not provide evidence to support third degree theft. In fact, Thomas conceded at trial that there was no affirmative evidence to support a theft charge.

It is not enough for the jury to simply disbelieve testimony that Thomas intended to return the wallet—under *Coryell*, affirmative evidence is necessary. There was no affirmative evidence to support third degree theft here. We therefore hold that the trial court did not abuse its discretion when it declined to instruct the jury on third degree theft.

CONCLUSION

We affirm the trial court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

CRUSER, J.

VELJACIC, C.J.